# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-3147

HARRIETT G. WOODWARD, Special Administrator
of the Estate of Justin Farver, deceased,

*Plaintiff-Appellee*,

v.

CORRECTIONAL MEDICAL SERVICES
OF ILLINOIS, INC.,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 6010—**Robert W. Gettleman**, *Judge.*

———————

ARGUED FEBRUARY 24, 2004—DECIDED MAY 17, 2004

———————

Before POSNER, RIPPLE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* After 23-year-old Justin Farver hanged himself with a bed sheet while a pretrial detainee at the Lake County (Illinois) jail, Harriet Woodward, his grandmother and the special administrator of his estate, sued Correctional Medical Services ("CMS," a private contractor hired by Lake County to provide medical and mental health services at its jail), CMS agents—nurse Karen Dean, social worker Joel Mollner, and Dr. Michael

Fernando—the sheriff of Lake County, and Alan Myres, a Lake County deputy sheriff, under 42 U.S.C. § 1983 and an Illinois wrongful death statute. During pretrial proceedings, the Lake County sheriff and deputy Myres settled with the estate and the estate dismissed its state law wrongful death claims against the remaining defendants.

After a 3-week trial, a jury found that CMS and its social worker, Mollner, acted with deliberate indifference to Farver's health and safety. The jury exonerated the other two CMS agents, nurse Dean and Dr. Fernando. Compensatory damages of $250,000 and punitive damages against CMS totaling $1.5 million were awarded.

After the jury's adverse verdict, CMS and Mollner moved for judgment as a matter of law under Rule 50(b) and for a new trial and a remittitur under Rule 59. The district court (Judge Robert W. Gettleman) denied the motions. Citing the deliberate indifference test for § 1983 liability under *Farmer v. Brennan*, 511 U.S. 825 (1994), the judge found that the estate "presented abundant evidence from which the jury could conclude that Mollner and CMS met these standards." The judge also specifically found that the trial testimony "allowed a reasonable jury to conclude that [Mollner] was not credible" and that he "was deliberately hostile to suicidal inmates including Justin." Judge Gettleman also concluded that CMS's "management's deliberate indifference to its staff's violations" of CMS's written policies and procedures was "sufficient to allow a jury to conclude that CMS tolerated if not encouraged the custom or practice that encompassed deliberate indifference to the substantial danger posed to the life and health of suicidal inmates including Justin."

The judge also rejected evidentiary challenges to the testimony of the estate's expert, Dr. Robert Greifinger, finding that "his testimony alone, in my view, would have supported the jury's verdict." The judge also held that it

was proper to admit evidence that CMS nurses reported for duty while under the influence of drugs and alcohol and that CMS's management was aware of that misconduct and condoned it. In denying CMS's motion for a remittitur, Judge Gettleman found that punitive damages were reasonable and "not out of line." Both CMS and Mollner appealed, but Mollner has settled up with the estate. So the only matter before us at this time is CMS's challenge to the verdict against it. We view the facts, in this fact-intensive case, in the light most favorable to the jury's verdict.

In 1996, Lake County published a "request for proposals" seeking bids from private contractors to provide medical and mental health services to the inmates at its jail. Because incarcerated inmates present a well-recognized risk of suicide, the county's request for proposals mandated that any service provider that contracted to provide mental and medical health services at the jail would conduct preliminary screening of inmates to identify those who presented a suicide risk. Lake County also required immediate assessment of all high-risk inmates in its request for proposals.

CMS submitted a bid proposal which contained detailed representations of preliminary screening and assessment services, including screening for potential suicide risks. CMS represented to Lake County that health-trained personnel would perform all such screenings. Specifically, CMS's proposal promised that:

> CMS will utilize a suicide identification form approved by Lake County Jail officials to be completed by medical personnel at the time of intake. Developed in 1985 by jail suicide specialist Joe Rowan and adopted for CMS's use in 1986, this program has drastically reduced the number of attempted and successful suicides in jail populations.

> If an inmate has been identified as suicidal or poten-
> tially suicidal, immediate referral to the mental health
> staff will be made so that appropriate housing and in-
> tervention can be started.
>
> Mr. Mollner will monitor inmates identified as at-risk
> for self-harm frequently until he is able to verbalize
> that they are no longer suicidal.
>
> Training sessions will be offered to facility staff to sup-
> port suicide prevention efforts.

In order to implement effectively its suicide prevention
program, CMS represented to Lake County that CMS would
recruit and hire trained and experienced employees,
hopefully ones with prior experience working in jails.

CMS, as it turned out, was the successful bidder, and
soon a contract was agreed to whereby it would be the sole
provider of mental and medical health services to inmates
at the Lake County jail. The contract incorporated the
terms and conditions set forth in Lake County's request for
proposals and CMS's responsive bid. In particular, CMS
agreed to provide a detailed and rigorous suicide risk iden-
tification and prevention program.

CMS promulgated its suicide identification and pre-
vention program in a policy and procedures manual. The
manual directed CMS employees to implement CMS's pro-
cedures to identify and treat potentially suicidal inmates at
the earliest possible moment. Specifically, CMS mandated
that inmates be screened for suicide potential immediately
upon admission to the jail. CMS medical personnel were
required to perform the initial screening by completing a
mental health intake screening form designed to detect
potential suicide risks. The directive in CMS's manual was
clear: "Whenever an inmate . . . reports a risk of self-
destructive behavior, immediate assistance will be pro-
vided."

CMS's mental health intake screening form consisted of a single page divided into six sections: Suicide Potential Screening, Psychiatric Screening, Behavioral Observations, Summary, Disposition, and Comments. CMS policy dictates that any employee administering the mental health screening and completing the CMS form was required to be qualified to do so. CMS even produced an instructional videotape that detailed how the form was to be used and described the danger suicide potential presented in jail settings. All CMS medical personnel were supposed to complete suicide identification and prevention training as part of their job orientation, and a critical portion of that training was to watch the videotape. In the videotape, according to a transcript of it admitted during the trial, CMS employees are told:

> Suicide is the tenth major cause of death in the United States. Some studies indicate the risk among inmates is 5 times higher than that within the community.

> We are responsible for the care and supervision of the inmates in our custody. Care includes protecting the inmate from himself or herself and from others. Care includes ensuring access to needed medical treatment. Since inmates are removed from their community support systems, it is our responsibility that they have support within the facility.

> Do not take the easy way and mark a line through all the no's. It can be difficult to convince a jury that the screening was completed in a thoughtful manner, or the documentation suggests a cursory approach to the screening process.

> The intake mental health screening has been designed to assist in identifying at-risk inmates upon admission to the facility so appropriate measures can be taken to minimize self-destructive . . . behavior. The

purpose of the screening process is to identify inmates requiring further evaluation. If there is any doubt, the inmate should be referred.

Expresses thoughts about killing self. Directly ask the inmate, "Are you thinking about killing yourself?" Although you may be uncomfortable asking this question, research indicates that the most accurate way of differentiating a suicidal from a nonsuicidal person is by simply asking the person about suicidal thoughts. Even if the inmate does not make direct suicide statements, such as "I am thinking of killing myself" or "I want to die," you should be alert to indirect suicide statements, such as "I won't be a burden anymore," "I have nothing to live for," or "No one will miss me while I am gone." These feelings should be explored by asking the additional questions about potential suicidal thoughts. Any direct or indirect suicidal statement should be scored a yes. When this question is scored a yes, notify your shift commander and refer to mental health.

If there are any circles in the shaded areas or the total number of yes's is 8 or more, your shift commander should be alerted and the inmate referred for further evaluation. If mental health staff are not on site, the inmate should be placed in a protective environment until the evaluation can be completed.

The intake screening form directed medical personnel to alert the jail's shift commander and to refer an inmate for mental health evaluation whenever an inmate responded "yes" to certain critical questions, including question number eight: "Expresses thoughts about killing self." When an inmate expressed thoughts of killing himself to the intake screener, the screener's training mandated that the inmate be marked as "suicidal" and having an "acute mental health problem." The screener was also directed to refer the

inmate to "suicide prevention procedures," including a "mental health referral ASAP."

CMS's suicide prevention procedures included notifying correction staff about the inmate's suicide risk, housing the inmate in a safe cell, and placing him on "suicide watch" where he would be physically checked every 15 minutes by correctional guards. CMS's suicide prevention procedures also dictated that a mental health evaluation be done as quickly as possible. CMS's policy further required its employees to implement appropriate mental health treatment after the mental health evaluation. Under CMS's written policy, its employees were required to continue suicide precautions until a CMS mental health professional determined that the treatment had eliminated the risk that an inmate might attempt to take his own life.

Despite the explicit recognition that the risk of suicide presented a unique and critical problem in a jail, the evidence at trial showed that CMS routinely failed to comply with its own directives on how risks were assessed and monitored. Willie Clark, a CMS nurse, testified that the environment at the jail was "very lax, unprofessional." For example, she testified that she was only made aware of the policies and procedures manual after she asked for it. Furthermore, CMS personnel purposely delayed ordering prescribed medication for inmates in hopes that the inmates would be transferred to the Department of Corrections and out of CMS's care.

Clark and another CMS nurse, Uleese Rachael Schreiner, also testified that CMS routinely had a month-long backlog of intake evaluation of inmates, contrary to written CMS policy and procedures. Schreiner reported this situation to nurse Therese Fryksdale, CMS's "chief of health administration," but nothing happened. Nurse Schreiner testified that she was encouraged by her CMS supervisors to disregard CMS's written policy and procedures. Nurse Clark testified

that she "was instructed by my administrator [Fryksdale] to go to booking and refuse people so that CMS would not get stuck with medical bills, even if it seemed relatively minor, because if they went out later, CMS would have to pay for it if they were booked. So I was to try and turn people away." According to Clark, Fryksdale told her "we don't send people out until they're at the point of imminent death." When Clark told Fryksdale this contradicted written policy, Fryksdale responded, "I'm sorry, kiddo, that's the way it is."

Nurse Clark also testified that she observed a CMS nurse under the influence of drugs and incapable of performing her duties and that she reported it to Fryksdale. Nurse Clark, who had previously worked in an alcohol rehabilitation center, further testified that she reported to Fryksdale about another nurse who was under the influence of alcohol at work and that Fryksdale acknowledged that this nurse had alcohol impairment problems in the past. Nurse Schreiner stated that she also observed nurses under the influence of alcohol at work and reported this misconduct repeatedly to Fryksdale, who ignored the situation, as well as to Robert Morse, CMS's regional director, who responded that Schreiner should simply go home if she did not like to work with impaired nurses. With this evidence in mind, we turn to Justin Farver's stay at the jail, which commenced on September 24, 1998.

Farver arrived at the jail charged with attempted sexual assault of his 12-year-old niece. Nurse Dean, who had never done a mental health intake screening for CMS, was called to the jail booking area to meet Farver soon after he arrived. Dean had no prior experience in psychiatric nursing, mental health nursing, jail nursing, or suicide diagnosis. Moreover, she did not complete the 90-day orientation program and did not document the completion of a single element of the orientation checklist during the 60-day period she worked for CMS (nurses were required to check off

items on an orientation checklist as they completed them). Dean, moreover, did not view the intake screening video-tape and never read CMS's policy and procedures relating to intake screening, identifying risk of suicide behavior, or handling identified candidates. Dean's entire training for how to conduct a mental health intake screening consisted of observing a few intakes performed by a more experienced nurse. Dean was told to follow the instructions on the mental health intake form and to fill it out completely.

When Dean first met Farver, she immediately noticed, among other things, that he had cerebral palsy which limited his dexterity and caused his hands to shake. Dean asked Farver questions on the intake screening form, noting "Yes" to question number 8, "Expresses thoughts of killing self." She also noted that Justin had a history of psychiatric treatment and suicide attempts. Despite those responses, Dean failed to complete the form by indicating that Farver presented a suicide risk in the "Summary" or "Disposition" sections. She also failed both to alert the jail's shift commander about Farver's condition or refer him for an immediate mental health evaluation. Due to these failings, Farver was lodged into the jail without suicide precautions and he was not put on the jail's suicide watch. He was also not referred for an expedited mental health evaluation, and the correctional staff was not notified that he posed a suicide risk.

Although Dean's intake performance did not comply with CMS's manual, Susan Buckley, CMS regional vice-president, testified that Dean "did a good job with that intake form." Dean's direct supervisor, Fryksdale, acknowledged that the intake directives regarding suicide prevention were often ignored. She testified that Dean's failure to initiate suicide prevention measures in Farver's case was consistent with standard operating practice at the jail.

Pursuant to a court order—presumably because he had cerebral palsy (according to deputy Myres his hands were always shaking and he had trouble walking)—Farver was held in a cell in the jail's "medical pod." Inmate Larry Dungey, in a cell next to Farver's cell, regularly noticed that Farver was depressed and that he frequently became upset and cried. Farver even told Dungey, "I can't take it anymore." During his entire stay, Farver was not placed on "suicide watch," which would have required a heightened degree of supervision.

Despite CMS policy that required a prompt mental health evaluation soon after the initial screening, 7 days went by before Farver was evaluated by a mental health professional—CMS's jail social worker, Mollner. CMS's published policy also required that medical records be complete and available for review by the health care staff when treating inmates. Mollner did not review Farver's medical chart before interviewing him. And that chart, it should be recalled, included nurse Dean's mental health intake screening form, which documented Farver's history of mental health problems, psychiatric hospitalizations, and suicide attempts.

Mollner acknowledged that a function of the mental health evaluation, and the form that flowed from it, was to provide subsequent treating professionals with knowledge about a patient. Mollner did not check Farver's chart before evaluating him on October 1. Mollner testified that it was *not* his regular practice to review the charts of inmates prior to conducting a mental health evaluation. He described this practice of not reviewing an inmate's chart variously as clinically beneficial—"Many times I go in there [without reviewing the chart] and get a fresh impression, not be biased."—or as a response to his workload—"I could have [made it a practice to review an inmate's chart before conducting a mental health evaluation]. But to do as many that had to be done . . . it took a considerable amount of

time. They had to go pretty smoothly. To have to keep going back and checking on everything, it never would have been possible."

Mollner testified that he was not aware of the following information on the intake form: that nurse Dean had circled "Yes" on question number 8, "Expresses thoughts of killing self"; she had noted a significant mental health history; she had documented several previous psychiatric hospitalizations; and she noted that Farver had a number of suicide attempts in his past. Mollner's direct supervisor, Fryksdale, approved of Mollner's habit of not reviewing an inmate's chart prior to conducting a mental health evaluation. Mollner asserted that immediately before he evaluated Farver, someone in the jail heard him expressing suicidal thoughts and that "it never crossed his mind that Justin was not on [suicide] watch."

Mollner completed a CMS mental health intake evaluation in connection with his October 1 interview. Mollner noted on the form that Farver

- had approximately 10 prior psychiatric hospitalization, the most recent in 1995 following a suicide attempt;

- had undergone outpatient mental health counseling;

- had a history of having prescribed psychotropic medication;

- was feeling depressed and not himself; and

- "Feels current suicidal proclivities."

Mollner recommended that Farver be treated for depression and indicated on the form that he be referred to the CMS psychiatrist for evaluation. Pursuant to CMS's manual, Mollner was required to ensure that an inmate in Farver's condition would be placed in an appropriate setting pending a psychiatric evaluation. This was not done.

Although Mollner documented that Farver was expressing "current suicidal proclivities," he did nothing to see that Farver was placed on suicide watch or housed in a safe cell pending a psychiatrist's examination. The record also shows that Mollner had a history of resisting placement of inmates on suicide watch. Mollner challenged possible suicide referrals made to him by both nurses and guards and became irate when other staff at the jail made suicide precaution referrals. For example, Mollner took an inmate off a suicide watch ordered by Clark, complaining that she was "making work for him, because now he had to go and evaluate all these people." When Mollner's resistance to following CMS's suicide prevention procedures was reported to Fryksdale, she responded, according to nurse Clark, "Oh, that's just Joe. Don't let it bother you. He gets like that."

Mollner also did not take any steps to arrange for Farver to see the CMS psychiatrist, Dr. Fernando, until October 11—7 days after Mollner saw Farver and 14 days after he arrived at the jail. Mollner, however, did tell Dr. Fernando that Farver was being referred because of his recent thoughts of suicide. Mollner states that he delayed referring Farver to the psychiatrist because he claimed Farver said he would refuse medication. But there is no documented evidence that Farver refused medication at any time.

Being CMS's psychiatrist in October 1998 was not Dr. Fernando's regular job but rather one of two "moonlighting" positions he held in addition to his psychiatric residency, which in itself demanded 70 to 100 hours of his time each week. Fernando also conducted group psychotherapy sessions each week and worked one day each weekend at the Lake County jail. Prior to working for CMS, Fernando had no correctional experience. Nor did CMS provide Dr. Fernando with its manual of procedures.

Dr. Fernando saw Farver on October 11. The doctor noted that Farver was expressing "suicidal ideation." Dr.

Fernando diagnosed Farver as suffering from a major depressive disorder and possibly a bipolar disorder. He concluded that Farver posed a risk of suicide. But, like nurse Dean and Mollner before him, Dr. Fernando did nothing to ensure that Farver was put on suicide watch: he did not review the available records to determine Farver's custody status and took no action to ensure that suicide prevention steps were taken. He prescribed medication to treat Farver's depression symptoms but he acknowledged that it would take at least several days, and as long as a number of weeks, for the medication to become effective. Farver was returned to his cell in the jail's medical pod.

Two days later, on October 13, Farver was on "lockdown," meaning he was confined to his cell and thus unable to go to the facility's "day room" with other inmates. He was distraught and upset and made repeated inquiries about being taken off lockdown. Sometime after noon, Farver was observed in his cell. He was pacing and agitated. Later, Farver was seen under his blankets "moving around."

At about 1:00 p.m., an inmate, Dungey, left the day room and returned to his cell. He saw Farver hanging from a bed sheet slung around four garment hooks attached to his cell wall. Dungey called for help. Myres came into the pod from his glassed-in observation area, followed by Fryksdale. Myres took off Farver's homemade noose. CPR and other efforts proved futile.

At trial, Woodward's expert witness, Dr. Greifinger, after testifying to his qualifications as a trained and experienced physician and consultant in the areas of prisons and health care, stated that Farver's suicide was caused by a "system failure" resulting from CMS's practice of ignoring its own policies and procedures. He stated that "once procedures are written, the staff have to be trained. They have to be told what the expectations are, and they have to become practiced at implementing those expectations." Most suicides

are preventable, and "in cases where there are warning signs, where there are red flags, the suicides are absolutely preventable."

Here, Dr. Greifinger had no quarrel with CMS's suicide prevention procedures, screening form, and instructional video, stating that it was "based on some very good research." The problem, Dr. Greifinger testified, was that CMS systematically ignored its own suicide prevention procedures. He noted that Farver "came in almost screaming for help," and that he had "never seen [a suicide risk] that was more [clearly documented] than this case."

Dr. Greifinger then described the ways in which CMS failed to follow its procedures with regard to Farver. Dean was not properly trained and failed to complete the mental health intake form. Pursuant to CMS's written policy, Dean should have alerted the jail's shift commander and referred Farver for mental health evaluation, neither of which Dean did. Greifinger noted that Fryksdale ratified Dean's faulty execution of the intake interview, stating that she "felt it was okay to ignore the procedure." Moreover, Greifinger testified, neither Mollner nor Dr. Fernando made any effort to ensure that CMS's suicide prevention procedures were implemented and did not advise the jail guards to place Farver on suicide watch, even though Farver's responses to screening questions indicated that he was suicidal.

With those facts in mind, we turn to CMS's main argument on appeal, that Woodward failed to establish that CMS was deliberately indifferent to the risk that Farver might commit suicide. CMS insists that it did all that was required of it and that, even on the record taken in the light most favorable to Farver, no reasonable trier of fact could find that it was deliberately indifferent to Farver's suicide risk. As CMS recognizes, it has a heavy burden on appeal. To sustain overturning a jury verdict, the record must demonstrate no "legally sufficient evidentiary basis for a

reasonable jury to find for the non-moving party." *Payne v. Milwaukee County*, 146 F.3d 430, 432 (7th Cir. 1998). We are obliged to leave the judgment undisturbed unless the moving party can show that "no rational jury could have brought in a verdict against [him]." *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 745 (7th Cir. 1994).

A successful § 1983 claim based on a violation of the Eighth Amendment in this case requires proof of two things: (1) that the potential harm to Farver was sufficiently serious, and (2) that CMS was deliberately indifferent to his health and safety. *See Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 556-57 (7th Cir. 2003) (citing *Farmer v. Brennan*); *Estelle v. Gamble*, 429 U.S. 97, 103-06 (1976). The first prong is obviously satisfied here. So the dispute is over whether CMS was deliberately indifferent.

We have said that deliberate indifference requires a showing of more than mere negligence (or even gross negligence) but less than purposeful infliction of harm. *Matos*, 335 F.3d at 557; *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). "A detainee establishes a § 1983 claim by demonstrating that the defendants were aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger." *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998). Although this is a "high hurdle for a plaintiff," *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002), he "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

With respect to CMS, we have stated that a corporate

entity[1] violates an inmate's constitutional rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Estate of Novack ex rel. v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (quoting *Payne*, 161 F.3d at 1043). "This liability is not founded on a theory of vicarious liability or *respondeat superior* that holds a municipality responsible for the misdeeds of its employees. Rather, a municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation. *Id.* (internal citations omitted). In other words, "it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 531 (internal citation omitted).

In *Novack* we noted that there are two routes a plaintiff may take to establish municipal liability. First, a constitutional injury caused by a municipality may be "shown directly by demonstrating that the policy itself is unconstitutional." *Id.* More specific for this case, municipal liability can also be demonstrated indirectly "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Id.* (quoting *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995)).

Applying this standard, we find that there was enough

---

[1] CMS has admitted that it was acting under color of state law as a contractor performing the public function of running a jail. Therefore, it is treated the same as a municipality for purposes of § 1983. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002) ("For purposes of § 1983, we have treated a private corporation acting under color of state law as though it were a municipal entity.").

evidence for the jury to conclude that CMS's actual practice (as opposed to its written policy) towards the treatment of its mentally ill inmates was so inadequate that CMS was on notice at the time Farver was incarcerated that there was a substantial risk that he would be deprived of necessary care in violation of his Eighth Amendment rights. First, the evidence established that CMS failed to adequately train its employees. Dean, who as we noted conducted Farver's intake proceedings, never completed her 90-day orientation program, never reviewed CMS's intake screening instructional video, never read CMS's manual concerning conducting intake screening and identifying and handling potential suicide risks, and never documented that she completed any of the orientation steps. Nor is Dean's lack of training an isolated incident. Nurse Clark testified, for example, that she received the manual only after she asked for it. CMS, moreover, condoned the practice of its employees not completing its mental health intake forms. Furthermore, Mollner testified that he did not review the intake forms, a practice which CMS management knew about and again permitted. Fryksdale also had knowledge that Mollner would challenge suicide watch referrals and was resistant to having a person be put on suicide watch. Again, Fryksdale allowed such a practice. Here, both Fryksdale and Morse knew of CMS employees' disregard for written policies and yet did nothing to ensure that they followed those procedures.

There was "a direct causal link," moreover, between CMS's deviation from its established policy and Farver's suicide. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). As the Court stated in *Monell*, "[I]t is when execution of [an entity's] . . . custom . . . inflicts the injury that the [entity] . . . is responsible under § 1983." *Monell v. N.Y. City Dep't of Soc. Svcs.*, 436 U.S. 658, 694 (1978). Here, a reasonable jury could find that CMS's custom of repeatedly failing to follow proper procedures led

to Farver's successful suicide attempt. The record shows that CMS employees knew that Farver was suicidal. Farver told Dean that he had attempted to kill himself in 1995. Mollner, moreover, learned that just before he interviewed Farver, Farver was overheard expressing thoughts of suicide. Mollner also was told that Farver had ten prior psychiatric hospitalizations, a history of violent behavior, and, as Mollner noted, had depressing thoughts. As Dr. Greifinger stated, Farver "came in almost screaming for help." Had CMS ensured that its own written policies were followed, nurse Dean would have notified the correction staff immediately that Farver was suicidal and ensured that he was placed on suicide watch. Farver would therefore have been physically checked on by correctional guards every 15 minutes. Furthermore, Mollner and Dr. Fernando would have made certain that Farver was put on such a watch. If any had acted, Farver would almost certainly not have been allowed to lie in his bed all day unchecked, making a noose out of a bed sheet.[2] He would, moreover, have been moved to a room without hooks on the wall. Under its own written policies, furthermore, Dean would have also made a "mental health referral ASAP." There would not have been a delay before Farver was ultimately seen by Dr. Fernando. At the very least, the medication Dr.

---

[2] A reasonable jury was entitled to reject CMS's defense that being put on suicide watch wouldn't have made a difference because a guard checked on Farver 9 minutes before he hanged himself. As Judge Gettleman noted:

> [I]t's highly probable in my view, at least the jury had sufficient evidence to conclude that Justin took much longer than nine minutes to fashion a noose from a bed sheet, stretch it over the row of hooks, put it around his head, and hang himself to death. Indeed, it must have taken him an extended period of time to do all that, given his dexterity limitations. Evan a casual suicide watch . . . would have detected this activity.

Fernando prescribed would have had a chance to take effect before Farver took his own life. The reality is that CMS's actual policy and practice caused its employees to be deliberately indifferent to Farver's serious health needs.

*Novack*, relied on by CMS, does not lead to a different result. In *Novack* the plaintiffs relied on flaws in the jail's policies for treating mentally ill patients. We affirmed the grant of summary judgment for defendants, however, because none of these policies were shown to have "caused jail personnel to be deliberately indifferent . . . . In other words, the evidence presented by the plaintiffs has not shown that but for [the defendants'] policies, [ ] personnel would have been aware that Novack posed a high risk of suicide and would have taken reasonable steps to prevent him from taking his own life." *Novack*, 226 F.3d at 532. In contrast, here there was a direct connection between inadequate CMS policies—not training its employees properly, permitting nurses not to completely fill out intake forms, allowing Mollner's practice of not reviewing intake forms, and condoning Mollner's resistance to putting inmates on suicide watch—and Farver's death for the jury to hold CMS liable.

Next, CMS argues that since the jury found nurse Dean not liable, the nature of her training and her treatment of Farver cannot be properly used as a basis for § 1983 liability against CMS. Indeed, in *Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003), we stated that "a municipality cannot be found liable if there is no finding that the individual officer is liable on the underlying substantive claim" (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)). Here, however, Mollner was found liable, and nurse Dean's lack of training and carelessness was therefore relevant towards establishing CMS's deliberate indifference towards the welfare of its inmates.

Finally, we cannot leave unaddressed CMS's claim that

"the plaintiff's failure to introduce evidence of any suicide at the Lake County jail besides Farver's dooms plaintiff's efforts to prove a custom or practice." CMS does not get a "one free suicide" pass. The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a "highly predictable consequence" of the municipality's failure to act. *See Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 409. Here, there was a direct link between CMS's policies and Farver's suicide. That no one in the past committed suicide simply shows that CMS was fortunate, not that it wasn't deliberately indifferent. Moreover, we note that CMS's liability is based on much more than a single instance of flawed conduct, such as one poorly trained nurse. It was based on repeated failures to ensure Farver's safety—by Dean, by Mollner, and by Dr. Fernando—as well as a culture that permitted and condoned violations of policies that were designed to protect inmates like Farver.

Here, the deliberate indifference to Farver's safety was demonstrated by CMS's condoning of its employees not following policies. As we recently noted, "Jail managers who decided to take no precautions against the possibility of inmate suicide—to have no policy, for example no suicide-watch option—would be guilty of deliberate indifference in the relevant sense . . . ." *Boncher v. Brown County*, 272 F.3d 484, 486 (7th Cir. 2001). For all intents and purposes, ignoring a policy is the same as having no policy in place in the first place. The jury was entitled to conclude that CMS was liable under § 1983, and Judge Gettleman did not err in denying CMS's post-verdict motion for judgment as a matter of law.

We next turn to CMS's argument that Judge Gettleman abused his discretion in denying CMS's motion for a new trial. CMS contends that it is entitled to a new trial based on "irrelevant" and "highly prejudicial" evidence that Judge Gettleman permitted the jury to hear, specifically evidence concerning the impaired nurse, intake backlogs, and claims

that medical care for other inmates was not provided or delayed. CMS claims that this evidence was only introduced to inflame the jury.

A party seeking to reverse a district court's denial of a motion for a new trial "bears a particularly heavy burden." *Lowe v. Consolidated Freightways of Delaware, Inc.*, 177 F.3d 640, 641 (7th Cir. 1999). A new trial may be granted in the event of an error in the admission of evidence only if the improperly admitted evidence had a "substantial influence over the jury" and the result was "inconsistent with substantial justice." *David v. Caterpillar, Inc.*, 324 F.3d 851, 864 (7th Cir. 2003). *See also* Fed. R. Civ. P. 61 ("No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."). We have recognized that "evidentiary errors satisfy this standard only if a significant chance exists that they affected the outcome of the trial." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000).

Here, evidence that CMS violated its written policies was relevant to determining its liability. The jury was entitled to conclude from all of the evidence that CMS was on notice that its employees ignored the medical needs of inmates and that such a practice could result in an inmate successfully committing suicide. We also note that CMS's failure to act in the face of known violations of its written policies is relevant circumstantial evidence to show CMS's knowledge and state of mind. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk [of serious harm] is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ."). Federal Rule of Evidence 404(b), moreover, permits the introduction of evidence of

other acts. Such evidence is relevant and admissible to show a custom or practice by a municipality. In any event, in the face of other evidence of CMS's disregard for its suicide policies in Farver's case, we do not believe the result was an unfair trial.

Finally, CMS argues that the jury's punitive damage award should be vacated. First, it contends that the record failed to establish a basis for punitive damages. Moreover, it argues that the award was based on evidence that was unfairly prejudicial, irrelevant, and inflammatory. We note that CMS does not raise a constitutional challenge to the punitive damage verdict. *Cf. State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S. Ct. 1513, 1520 (describing the constitutional limitations on punitive damage awards). Thus, we review Judge Gettleman's decision not to grant a remittitur only for abuse of discretion. *See Cooper Indus., Inc. v. Letterman Tool Group, Inc.*, 532 U.S. 424, 433 (2001).

Punitive damages are recoverable in § 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 35, 51 (1983). This is the same standard as for § 1983 liability, "[B]oth require a determination that the defendants acted with deliberate indifference or reckless disregard . . . ." *Walsh v. Mellas*, 837 F.2d 789, 801 (7th Cir. 1988). As we noted above, there is ample evidence for the jury to conclude that CMS was deliberately indifferent to the risk of suicide within the jail. Both Clark and Schreiner described a routine disregard for policies and procedures which was condoned by CMS management. Nurses were not properly trained, Mollner did not review intake forms and resisted placing inmates on suicide watch, Fryksdale and Morse tolerated nurses who were intoxicated and refused to refer ill patients to the hospital in order to save money. All of this evidence established a corporation that had little regard for the inmates whose care it was charged with.

Nor did Judge Gettleman abuse his discretion in his evidentiary rulings. In making its argument, CMS relies heavily on *State Farm Mutual.* In that case, the Supreme Court emphasized that "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." 123 S. Ct. at 1523. That case, however, is distinguishable. There, the trial court admitted evidence of conduct at State Farm offices in other states, although such conduct was proper and lawful in those jurisdictions. Here, the court admitted conduct only regarding CMS's deliberate indifference to the medical care of the inmates in the Lake County jail.

We have considered CMS's remaining arguments and find them unpersuasive. The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

                              _____

                              *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*