In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1603

SORAIDA FLORES, a Personal Representative of the Estate of
ERICA FLORES, deceased,

*Plaintiff-Appellant*,

*v.*

CITY OF SOUTH BEND and JUSTIN GORNY,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 19-cv-00064-JTM-JPK — **James T. Moody**, *Judge*.

ARGUED OCTOBER 28, 2020 — DECIDED MAY 12, 2021

Before RIPPLE, WOOD, and BRENNAN, *Circuit Judges*.

WOOD, *Circuit Judge*. Erica Flores's life came to an un-
timely end when Officer Justin Gorny of the South Bend, In-
diana, police department careened through residential streets
and a red light at speeds up to 98 mph to reach a routine traffic
stop he was not invited to aid, crashed into Flores's car, and
killed her. Flores's personal representative, Soraida Flores,

sued Gorny and the City under 42 U.S.C. § 1983 and associated state laws, asserting that Gorny violated Erica's substantive-due-process rights and that the City was liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for failing adequately to train its police officers. (We refer to Flores as the plaintiff without distinguishing between the victim and the estate representative unless the context otherwise requires.) The district court dismissed the action on the pleadings. We find, however, that Flores's allegations plausibly state claims against both defendants, and thus that she is entitled to proceed with her case. We therefore reverse and remand.

**I**

In the early hours of July 20, 2018, five South Bend officers ("the Hipakka team") were assigned to an area in the northwest part of the city, which was considered to be a "hot spot." Two of them—Zachary Alfrey and James Wagner—patrolled in an unmarked car that was not equipped with sirens or lights. One—Sergeant Ryan Hipakka—drove a fully marked police vehicle. The remaining two officers—Gregory Howard and Mollie O'Blenis—sat in an unmarked car that did have sirens and lights, though they were not in use. The two patrolling officers communicated through a tactical channel whenever they wanted assistance from the other three officers.

The events that led to Erica's death began when, around 4:30 am, Alfrey and Wagner radioed over the tactical channel that they had spotted a vehicle speeding in the patrol area and planned to stop it. The remaining three officers promptly acknowledged the report. None of the members of the Hipakka team signaled at any point that the routine traffic

stop qualified as an emergency. None of them requested assistance from any other officers outside their group, and none pursued the driver.

Enter Officer Gorny. After hearing the exchanges among the Hipakka team over the tactical channel and knowing from those exchanges that no one was asking for external assistance, Gorny (then two miles away from the Hipakka team) roared through a residential neighborhood at 78 miles per hour, in disregard of the 30 mile-per-hour speed limit. Gorny made infrequent use of his lights or sirens. Still in the residential area, he then turned onto Western Avenue and accelerated up to 98 miles per hour while intermittently activating and deactivating his lights and sirens. Gorny reached the intersection of Kaley and Western Avenues with an obstructed view of Kaley Avenue. Disregarding the red light, Gorny sped through the intersection and crashed into Erica Flores's car, which was proceeding lawfully on a green light, killing her.

## II

Because we are considering a dismissal under Rule 12(b)(6), we "accept[] as true all well-pleaded facts and draw[] all reasonable inferences in favor of the non-moving party." *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020). The account we have just furnished reflects these principles. In order to survive a motion to dismiss on the pleadings, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).

Flores challenges the district court's dismissal of her section 1983 claims against both defendants. We address her individual claim against Gorny first, and then her *Monell* claim against the City. We also briefly touch on Flores's challenge to the district court's denial of leave to amend the complaint.

A

A person seeking relief under section 1983 for a violation of her Fourteenth Amendment right to substantive due process faces a difficult task. She must plead sufficient facts to establish that the officer acted with "criminal recklessness—which is the same as deliberate indifference." *Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996) (quoting *Archie v. City of Racine*, 847 F.2d 1211, 1222 (7th Cir. 1988)); see also *County of Sacramento v. Lewis*, 523 U.S. 833, 839 (1998) ("deliberate indifference" or "reckless disregard"). Criminal recklessness in this context has long served as an effective proxy for intent, *Hill*, 93 F.3d at 421 (citing *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996)), but we do not demand "smoking gun" proof of actual intent. *Cf.* FED. R. CIV. P. 9(b) (" … intent … may be alleged generally"). It is enough to plead plausibly "that the defendant had actual knowledge of impending harm which he consciously refused to prevent." *Hill*, 93 F.3d at 421.

The deliberate-indifference standard demands close attention to the particulars of the case. Identical behavior considered reasonable in an emergency situation might be criminally reckless when state actors have time to appreciate the effects of their actions. See *Lewis*, 523 U.S. at 850. This is why officers giving chase, who "are supposed to act decisively and to show restraint at the same moment," have more latitude to balance these competing directives. *Id.* at 853. Officers re-

sponding to a nonemergency situation or inserting them-selves into a situation that is already under control face a dif-ferent set of constraints. They cannot reasonably expect to en-gage in the same conduct considered acceptable in the heat of an emergency.

The key question is whether the officer "ha[d] sufficient knowledge of the danger" such that "one can infer he in-tended to inflict the resultant injury." *Id*. In *Hill*, we con-fronted a case superficially similar to the one now before us. There, a police officer who was not responding to an emer-gency situation sped "well over the speed limit" through a red light and crashed into the decedent's car, killing him. *Id*. We concluded that this bare factual allegation allowed at most the inference that the officer created a "generic risk to the public at large" that "d[id] not rise to the threshold of a constitu-tional violation actionable under § 1983." *Id*. at 421–22.

The district court found *Hill* dispositive and concluded that Flores's complaint similarly failed to allege sufficient facts to permit the inference that Gorny subjectively knew of the danger he created and consciously disregarded it. Gorny's actions, the court thought, supported at most a reasonable in-ference that he created a generic risk to the general public through his reckless speeding and disregard of traffic signals. In our view, however, the facts alleged here go well beyond those in *Hill*, and the difference matters.

An officer who is not responding to an emergency can act so recklessly that a trier of fact would be entitled to find sub-jective knowledge of an unjustifiable risk to human life and conscious disregard of that risk. Our sister circuits have en-countered similar factual allegations, and we find their opin-ions to be instructive. In *Sauers v. Borough of Nesquehoing*, 905

F.3d 711 (3d Cir. 2018), an officer observed a minor traffic of-
fense and followed a car at 100 miles per hour, lost control of
his car around a curve, spun out, and crashed into the plain-
tiff's car, injuring the plaintiff and killing his wife. *Id.* at 715,
718. The Third Circuit held that these allegations supported
an inference of deliberate indifference, because the officer had
time to phone other officers along the violator's route and ask
them to effect the traffic stop. In addition, the traffic violation
was too minor to warrant the dramatic chase. See also *Browder
v. City of Albuquerque*, 787 F.3d 1076, 1081 (10th Cir. 2015)
(finding that an off-duty officer driving home at an average of
66 miles per hour over an 8.8-mile stretch through ten inter-
sections before running through a red light and crashing into
the plaintiff's car operated with "conscious contempt of the
lives of others and thus a form of reckless indifference").

Here, Gorny's reckless conduct, unjustified by any emer-
gency or even an order to assist in a routine traffic stop that
five officers had under control, allows the inference that he
subjectively knew about the risk he created and consciously
disregarded it. Unlike the minimally detailed complaint in
*Hill*, which again was limited to an accusation of speeding, the
complaint here paints a far more troubling picture. Gorny,
who was not assigned to the hot-spot area, overheard
Hipakka, Howard, and O'Blenis communicate their assent to
Alfrey and Wagner's request for assistance specifically from
the other members of their team. At no point did Gorny hear
any officer indicate that he or she needed external back-up or
that the traffic stop presented an emergency. With no justifi-
cation, Gorny chose to race through a residential area with a
posted speed limit of 30 miles per hour at rates of speed be-
tween 78 and 98 miles per hour, two-to-three times the limit.

It was too late to control the car when he reached the intersection of Kaley Avenue and charged through, despite the obstructed view. The result, as we have said, was that Flores, innocently driving in accordance with the traffic signals, was hit and killed. A jury could find, based on these allegations, that he displayed criminal recklessness (or deliberate indifference) to the known risk.

The defendants counter that Gorny could not have known that he created an imminent risk of fatal injury if he had an obstructed view of oncoming traffic. But the law does not require perfect knowledge on his part: criminal recklessness is enough, and driving blind through an intersection at 78 to 98 miles per hour could certainly be viewed by a jury as meeting that standard. The law does not provide a shield against constitutional violations for state actors who consciously take extreme and obvious risks. Through his course of action, Gorny was "willing to let a fatal collision occur." *Hill*, 93 F.3d at 421. Moreover, Gorny's actions well before he entered the intersection could be seen as criminally reckless. (He did not go from zero to 80 miles per hour from a standstill.) We have cautioned against "reading [] classifications too rigidly, noting that '[d]eliberate indifference, in fact, is merely the manifestation in certain situations of a more general inquiry, which is whether the government conduct at issue shocks the conscience.'" *Bublitz v. Cottey*, 327 F.3d 485, 490 (7th Cir. 2003) (quoting *Schaefer v. Goch*, 153 F.3d 793, 797 (7th Cir. 1998)). A jury could find that Gorny's actions meet this standard.

B

This brings us to Flores's suit against the City of South Bend. She may move forward against the City only if her alle-

gations plausibly assert that the City itself caused a constitutional violation. *Dunn v. City of Elgin*, 347 F.3d 641 (7th Cir. 2003) (citing *Monell*, 436 U.S. at 694). Municipalities do not face *respondeat superior* liability under section 1983 for the misdeeds of employees or other agents. Only actions of the entity will suffice.

The district court dismissed Flores's *Monell* claim against the City of South Bend because it found no underlying constitutional violation by Officer Gorny. Since we are reversing on that point, however, it is appropriate to take a fresh look at Flores's *Monell* claim, too.

We begin with an overview of the law in this area. Flores proposes to show that the City itself violated her rights by failing to train its police to refrain from reckless driving. The Supreme Court recognized the failure-to-train theory in *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Acknowledging that the courts of appeals universally recognized that "a municipality's failure to train employees can [] be a basis for § 1983 liability," but also that liability depends on deliberate indifference, the Court in *Harris* focused on the *degree of fault* that is required to support liability on this basis. *Id*. It concluded that failure-to-train liability is appropriate only when inadequate training "amounts to deliberate indifference to the rights of persons with whom the [employee] come into contact." *Id*. In effect, by failing to train an employee whose conduct the municipality knows to be deliberately indifferent to the public, the municipality itself demonstrates deliberate indifference to that known risk.

Since *Harris*, the Court consistently has reaffirmed that this form of liability remains available for plaintiffs who can meet *Harris*'s strict threshold showing. Just under a decade after

*Harris*, the Court explained in *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997), that failure-to-train (or inadequate-training) liability arises when a municipality adheres to a training program "that they know or should know has failed to prevent tortious conduct by employees," thereby demonstrating deliberate indifference to this known risk. *Id*. at 407. What separates this liability from traditional *respondeat superior* liability is a known pattern of tortious conduct demonstrating the need for additional training, "rather than a one-time negligen[ce]." *Id*. at 407–08.

Even as the Court has underscored that failure-to-train liability is rare, it has never wavered from the position that this theory remains valid. Most recently in *Connick v. Thompson*, 563 U.S. 51 (2011), it recognized that a municipality's "decision not to train certain employees," despite actual or constructive notice that their actions constitute deliberate indifference to the rights of the public with whom they come into contact, is the "functional equivalent of a decision by the city itself to violate the Constitution." *Id*. at 61 (internal quotations omitted).

Notably, failure-to-train liability does not require proof of widespread constitutional violations before that failure becomes actionable; a single violation can suffice where a violation occurs and the plaintiff asserts a recurring, obvious risk. As the Court put it in *Brown*, "we did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." 520 U.S. at 409; see also *Connick*, 563 U.S. at 64 ("[We] sought not to foreclose the possibility, however rare,

that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.").

Applying these principles, we have upheld failure-to-train allegations on at least two occasions. Sitting en banc in *J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020), we addressed a case in which two former inmates in the Polk County Jail sued the County for failing adequately to train male guards to prevent their sexual abuse of female inmates. *Id*. at 678–79. The County's training was limited to informing guards that the jail prohibited sexual contact with inmates and holding a single training session that some officers, including the offender in the case, did not attend. *Id*. at 379. We found that these allegations sufficed to support failure-to-train liability. *Id*. So too in *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004), we held that a correctional facility's failure to train its employees on suicide prevention (among other shortcomings), resulting in the death of an inmate, supported *Monell* liability. *Id*. at 927–29. We reached this conclusion even though the plaintiff could not prove that any other inmates had lost their lives because of this failure to train, because the prison did not "get a one free suicide pass." *Id*. at 929 (internal quotation marks omitted).

We realize that the Supreme Court has yet to issue an opinion in which it upholds liability on this ground, but we take the Court at its word that this does not mean it has disapproved the theory. At least one of our sister circuits has upheld *Monell* liability under a failure-to-train theory, and others have found allegations to be sufficient to survive summary judgment or a motion to dismiss, without any sign of disapproval from the Supreme Court. See *Ouza v. City of Dearborn*

*Heights*, 969 F.3d 265, 289 (6th Cir. 2020) (failure to train arresting officers on probable-cause determinations and use of force); *Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x 194, 199 (3d Cir. 2018) (failure adequately to train and supervise staff at a county-owned nursing home to identify and treat patient conditions); *Shadrick v. Hopkins County*, 805 F.3d 724, 740–42 (6th Cir. 2015) (failure adequately to train nurses subcontracted to provide constitutionally adequate medical care for county inmates); *Thomas v. Cumberland County*, 749 F.3d 217, 225 (3d Cir. 2014) (failure to train prison staff on de-escalation and intervention training given the "highly predictable" nature of fights in the prison); *Haley v. City of Boston*, 657 F.3d 39, 52–53 (1st Cir. 2011) (City's failure adequately to train Boston Police Department on disclosure obligations); *Langford v. Union County*, 51 F. App'x 930 (5th Cir. 2002) (failure to train jail personnel to care for individuals in custody while awaiting transfer to a State mental-health hospital); *Young v. Devaney ex rel. City of Augusta*, 59 F.3d 1160, 1173 (11th Cir. 1995) (failure to train jail personnel on treating inmates' mental health needs); *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992) (failure "to train and supervise the police not to commit perjury or assist in the conviction of the innocent"); *Parker v. D.C.*, 850 F.2d 708, 713–14 (D.C. Cir. 1988) (failure to train, supervise, and discipline officers regarding extra-jurisdictional-arrest authority as well as inadequate physical training and disarmament training); see also *Smith v. D.C.*, 413 F.3d 86, 98 (D.C. Cir. 2005) (analogizing the District of Columbia's failure to set standards for monitoring and selecting Youth Services Administration providers to a successful failure-to-train claim); *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (theory of "condonation," wherein Baltimore Police Department condoned officers' practice of

"knowingly, consciously, and repeatedly withholding and suppressing exculpatory evidence," sufficient to survive a motion to dismiss) (cleaned up); *Lucente v. County of Suffolk*, 980 F.3d 284, 305–07 (2d Cir. 2020) (discussing *Connick* and finding that County's failure to discipline prison staff despite knowledge of a history of sexually assaulting female inmates sufficient to survive summary judgment); *Newton v. City of New York*, 779 F.3d 140, 154 n. 11 (2d Cir. 2015) (noting that a failure-to-train claim against the City for inadequately training NYPD officers on evidence management likely would have been upheld had the plaintiff advanced that claim on appeal).

With this background in mind, we turn back to Flores's case. The complaint asserts that the City failed to train Gorny not to drive recklessly, in the face of actual knowledge that both Gorny himself and South Bend police officers generally had a history of reckless speeding. It also asserts that the City has a *de facto* policy of encouraging such behavior. South Bend officers working the night shift, Flores contends, frequently drive above 50 miles per hour, well above posted limits. In addition, she alleges that on at least three occasions before Erica Flores's death, Gorny operated his vehicle at high rates of speed (70 mph, 114 mph, and 60 mph). Yet, despite telling its officers to operate their vehicles only up to a maximum of 50 miles per hour, South Bend never reprimanded anyone for noncompliance with its policies, nor did it require additional training for those who disregarded its guidance.

Flores argues that this is enough to support *Monell* liability under both a theory of failure to train and a theory that the City had a *de facto* policy of encouraging or permitting excessively fast driving. Taking the latter point first, we do not see

enough in this complaint to permit Flores to proceed on the *de facto* policy theory. Allegations that officers sometimes drive at high rates of speed do not show a sufficiently specific pattern of conduct to "support the general allegation of a custom or policy." *Hollins*, 574 F.3d at 827. Finding otherwise would stretch the law too far, opening municipalities to liability for noncodified customs in all but the rarest of occasions, as long as a plaintiff can find a few sporadic examples of an improper behavior. Nothing in *Brown*, *Harris*, or *Connick* supports such an outcome.

But the failure-to-train theory is another matter. Stressing that we are still at the pleading stage, we conclude that Flores's complaint plausibly alleges that the City acted with deliberate indifference by failing to address the known recklessness of its police officers as a group and Gorny in particular. Looking at Gorny first, the complaint asserts that on at least three prior occasions, Gorny drove in the dark of night at extreme speeds (from 60 to 114 mph), well above the posted limits of 30 miles per hour, and even above the alleged 50 mile-per-hour policy limit. The City knew that its officers routinely drove over 50 miles per hour, but it took no steps to prevent this behavior—no training, no discipline, no reprimands.

A municipality can be held liable under a theory of failure to train if it has actual knowledge of a pattern of criminally reckless conduct and there is an obvious need to provide training to avert harm, even if the prior acts have yet to result in tragedy. See *Harris*, 489 U.S. at 390 n.10; *J.K.J.*, 960 F.3d at 380. The City urges us to dismiss Flores's claim because (fortunately) Gorny never killed anyone before he took Erica Flores's life. But this is not a "one-free-bite" situation. The law

does not require the death or maiming of multiple victims before a city must institute proper training. Driving with deliberate indifference to the consequences of one's action—in effect, turning oneself into a speeding bullet—can reach the level of criminal recklessness before the worst happens. Flores's allegations are enough to survive a motion to dismiss. We of course offer no opinion on the way this case will look after all parties have had the chance to develop the factual record further.

C

We turn finally to Flores's challenge to the district court's denial of leave to amend the complaint. We review such a ruling only for abuse of discretion. *Foster v. DeLuca*, 545 F.3d 582, 583 (7th Cir. 2008) (citing *Indiana Funeral Dirs. Ins. Trust v. Trustmark Ins. Corp.*, 347 F.3d 652, 655 (7th Cir. 2003)). Generally, we expect that the district court will grant leave to amend when a complaint is challenged at such an early stage. Rule 15 of the Federal Rules of Civil Procedure advises as much, when it states that "the court should freely give leave when justice so requires." Rule 15(a)(2); see *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). In light of our decision to reverse on both claims, we have no need to comment further on this point. We leave to the district court's sound discretion any further decisions about amendments to the pleadings.

**III**

Accepting the facts as alleged in the complaint for present purposes, Officer Gorny's conduct in this matter reflected deliberate indifference to the obvious risk he created when he sped through residential areas and launched himself through an intersection, against the light, without the ability to see or

adjust to cross-traffic. We therefore REVERSE the dismissal of Flores's section 1983 claim against Gorny and REMAND for further proceedings. Given the City's alleged knowledge of not only Gorny's past speeding, but also that of other officers, we also REVERSE and REMAND Flores's claims against the City insofar as they are based on a failure-to-train theory.

BRENNAN, *Circuit Judge*, concurring. I agree with my colleagues that plaintiff-appellant provided enough facts to state a facially plausible failure-to-train claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). I write separately to examine the single-incident theory of failure-to-train liability under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), and the majority opinion's generalized discussion of it.

The majority opinion states that a municipality can be liable for failure to train under the single-incident theory "if it has actual knowledge of a pattern of criminally reckless conduct and there is an obvious need to provide training to avert harm, even if the prior acts have yet to result in tragedy." Majority Op. at 13 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n. 10 (1989), and *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 380 (7th Cir. 2020)).

Although this statement is not incorrect, I do not know that it fully captures the complexity of *Monell* jurisprudence in this area. To establish single-incident liability, a plaintiff must prove that municipal policymakers know that its employees will confront a given situation and not train for it, *Canton*, 489 U.S. at 390 n.10, and the need for training must be obvious without consideration of prior violations. *See Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011); *see also Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997) (noting that under the single-incident theory, the question is whether the risk is obvious in the abstract). But there is more. The single-incident theory is reserved for the "narrow" circumstance when a municipality fails to train its employees, who "have no knowledge at all of the constitutional limits" that govern their conduct in situations they are certain to encounter. *Connick*, 563 U.S. at 64, 67. This remains true even though there is

"no reason to assume" that the municipal employees are "familiar with the constitutional constraints" on their own. *Id.* at 64.

Liability for failure to train under the single-incident theory remains "rare." *See id.* (explaining that single-incident liability applies only to a "narrow range" of circumstances). The majority opinion states: "At least one of our sister circuits has upheld *Monell* liability under a failure-to-train theory, and others have found allegations to be sufficient to survive summary judgment or a motion to dismiss, without any sign of disapproval from the Supreme Court." This sentence, which is followed by citations to a number of decisions, could be overread to suggest that liability under this theory is widely endorsed. But of those decisions, only the D.C. Circuit in *Parker v. District of Columbia*, 850 F.2d 708 (D.C. Cir. 1988)—a case that predates *Connick*, *Bryan County*, and *Canton*—upheld failure-to-train liability. In *Smith v. District of Columbia*, 413 F.3d 86, 98–99 (D.C. Cir. 2005), the D.C. Circuit only analogized the municipality's lack of monitoring standards to a failure-to-train claim. And in *Newton v. City of New York*, 779 F.3d 140, 153 n.11 (2d Cir. 2015), the Second Circuit only contemplated a failure-to-train claim because the plaintiff did not pursue the case on that theory. The remaining decisions concern allegations sufficient to survive a dispositive motion.

I write separately only so courts and litigants in the future recall the intricacies of *Monell* jurisprudence and do not misread precedent in this area. I agree with the majority opinion's resolution of this case, and I respectfully concur.