**11-2610-cv**
**Newton v. City of New York**

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**


August Term, 2012


(Argued: October 3, 2012          Decided: February 26, 2015)


Docket No. 11-2610-cv


_____


ALAN NEWTON,

*Plaintiff-Appellant,*

v.

CITY OF NEW YORK,

*Defendant-Appellee.*\*

_____


Before:

LYNCH, LOHIER, and DRONEY, *Circuit Judges*.

---

\*    The Clerk of Court is respectfully directed to amend the official caption to conform with the above.

Appeal from a judgment of the United States District Court for the Southern District of New York granting the defendants' motion to set aside a jury verdict for plaintiff Alan Newton, who spent over twenty years in prison for rape, robbery, and assault before he was exonerated by DNA evidence. The jury found that the City of New York had denied Newton his constitutional rights to due process and access to the courts when it failed to produce the rape kit that eventually exonerated him. In granting the post-verdict motion, the District Court relied on our decision in *McKithen v. Brown*, 626 F.3d 143 (2d Cir. 2010). We conclude that (1) *McKithen* does not foreclose Newton's due process claim; (2) Section 440.10(1)(g) of the New York Criminal Procedure Law, which permits a court to vacate a conviction based on newly discovered evidence, gave Newton a liberty interest in demonstrating his innocence with new evidence; and (3) substantial evidence supported the jury's finding that the City acted with recklessness or deliberate indifference toward Newton's constitutional rights. **VACATED** and **REMANDED** with instructions to reinstate the jury verdict with respect to Newton's Fourteenth Amendment claim and to reconsider Newton's First Amendment claim in light of this opinion.

JOHN FRANCIS SCHUTTY, III, Law Office of John F. Schutty, P.C., New York, NY; David T. Goldberg, Donahue & Goldberg, LLP, New York, NY; Eric J. Hecker, Cuti Hecker Wang LLP, New York, NY, *for* Plaintiff-Appellant.

DRAKE A. COLLEY, Edward F.X. Hart, Arthur G. Larkin, *for* Michael A. Cardozo, Corporation Counsel for the City of New York, New York, NY, *for* Defendant-Appellee.

James W. Quinn, Karin S. Portlock, Devin M. Cain, Weil, Gotshal & Manges LLP, New York, NY; Keith A. Findley, Innocence Network, University of Wisconsin Law

School, Madison, WI, *for amicus curiae* The Innocence Network.

Andrew H. Schapiro, Molly A. Karlin, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for amici curiae* Evidence-Management Professionals Bruce Adams, Kolene Dean, Ron K. Peterson, John San Agustin, John Vasquez.

LOHIER, <u>Circuit Judge</u>:

Nearly thirty years ago, Alan Newton was wrongly convicted of a crime he didn't commit. He served over twenty years in prison. Had he been given access to exonerating DNA evidence that the City of New York long misplaced and mishandled, Newton very likely would have been a free man years earlier. Newton and his attorneys procured his freedom, and a New York State court vacated his conviction, only after countless efforts to access that evidence finally came to fruition in 2006. Once freed, Newton sued the City and various officials in the New York City Police Department ("NYPD"), claiming that the City's evidence management system was inadequate and had deprived him of his rights to due process and access to the courts in violation of the Fourteenth and First Amendments, respectively. Newton prevailed in a federal jury trial in the United States District Court for the Southern District of New York on these constitutional claims against the City, but the District Court set aside the verdict based on our decision in <u>McKithen v. Brown</u>, 626 F.3d 143 (2d Cir. 2010).

3

We consider two primary issues on appeal. First, does New York law provide a convicted prisoner a liberty interest in demonstrating his innocence with newly available DNA evidence? Second, if so, does the Due Process Clause of the Fourteenth Amendment entitle such a prisoner to reasonable procedures that permit him to vindicate that liberty interest? McKithen answers neither of these questions; District Attorney's Office for the Third Judicial District v. Osborne, 557 U.S. 52 (2009), requires that we answer both in the affirmative. We therefore vacate and remand with instructions to reinstate the jury verdict with respect to Newton's Fourteenth Amendment claim and to reconsider Newton's First Amendment claim in light of this opinion.

**BACKGROUND**

A.   Alan Newton's Conviction

On June 23, 1984, a woman, V.J., was assaulted, raped, and robbed after leaving a convenience store in the Bronx. V.J. lost her left eye and suffered four broken ribs. She described her attacker to a police detective as a black male who identified himself as "Willie," approximately five feet, nine inches tall, from twenty-five to twenty-seven years old, with a moustache and short, neat afro. The NYPD collected a rape kit from V.J. that contained pubic and head hair, three cotton swabs, and four microscope slides. Based on photo arrays and later an in-person line-up, V.J. identified Newton as her assailant. A store clerk, too, identified Newton from a photo array and a line-up.

4

In May 1985 a Bronx County jury convicted Newton of rape, robbery, and assault based on eyewitness testimony, including the store clerk's and V.J.'s identification of Newton as her attacker.   Newton was sentenced to concurrent prison terms of eight and one-third to twenty-five years for each of the rape and robbery charges and a consecutive term of five to fifteen years for the assault. The rape kit was not tested for DNA evidence prior to Newton's trial.[1]

B.     Attempts to Obtain DNA Testing and Exoneration

In 1988 Newton moved for an order authorizing an expert to inspect the rape kit and conduct forensic tests to permit him to move to set aside his verdict pursuant to New York Criminal Procedure Law Section 440.10.[2]

---

[1] At the time, only limited serological testing was available.

[2] At all relevant times, Section 440.10 provided as follows:

> At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that . . . [n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence . . . .

N.Y. Crim. Proc. Law § 440.10(1)(g) (McKinney 2012); N.Y. Crim. Proc. Law § 440.10(1)(g) (McKinney 1970).

The New York State Supreme Court granted Newton's motion and ordered the Bronx County District Attorney to arrange to deliver the DNA sample to the City's Office of the Chief Medical Examiner, where Newton's expert could supervise testing. The District Attorney's Office retrieved the rape kit from the NYPD's Property Clerk Division ("PCD") and delivered it to the Office of the Chief Medical Examiner, which reported that the sample contained no testable spermatozoa.

Six years later, in 1994, the New York State legislature enacted New York Criminal Procedure Law Section 440.30(1-a), which permits a defendant to seek testing of DNA evidence in order to vacate his conviction as follows:

> [W]here the defendant's motion requests the performance of a forensic DNA test on specified evidence, and upon the court's determination that any evidence containing deoxyribonucleic acid ("DNA") was secured in connection with the trial resulting in the judgment, the court shall grant the application for forensic DNA testing of such evidence upon its determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a reasonable probability that the verdict would have been more favorable to the defendant.

N.Y. Crim. Proc. Law § 440.30(1-a) (McKinney 1994). Shortly after Section 440.30(1-a) was enacted, Newton filed a pro se motion in State court seeking DNA testing of the rape kit on the ground that technological advances since 1988 had enabled scientists to test samples they had previously deemed untestable. In opposing the motion, the District Attorney's Office responded that its extensive

6

investigation had revealed that the physical evidence was never returned after the 1988 analysis and that the rape kit could not be found at the District Attorney's Office, the PCD, or the Office of the Chief Medical Examiner. The State court denied Newton's motion.

In 1995 Newton filed a habeas corpus petition under 28 U.S.C. § 2254 in the Southern District of New York. In the course of the habeas proceeding, and in response to Newton's request in that proceeding that the City produce the rape kit for testing, the City informed Newton and the court that the kit "could not . . . be located." Joint App'x 3316. Other than V.J.'s clothes, which the City was able to find as part of its response to Newton's petition, little else appears to have come of Newton's habeas proceeding. And so, in 1998, Newton again sought DNA testing of the rape kit and other physical evidence from State court. Citing conversations with the PCD, the District Attorney's Office reaffirmed that the rape kit could not be located and opposed the motion. As part of the government's opposition, an NYPD Sergeant explained that the voucher describing the location of the rape kit was not in its last listed location and that the kit "must have been destroyed." Joint App'x 2779. The Sergeant elaborated that the voucher was probably destroyed, either because a 1995 fire at the Property Clerk's Office had destroyed several files or because the Property Clerk's Office had a practice of destroying inactive records after six years. Although the State court granted Newton's motion insofar as he sought DNA

7

testing of V.J.'s clothes, which the police had found, it denied his motion as to the rape kit.

In 2005 Newton, through counsel, asked an Assistant District Attorney ("ADA") who was then Chief of the Sex Crimes Bureau of the Bronx County District Attorney's Office and who had previously not been directly responsible for handling Newton's case whether the PCD would search once more for the rape kit. Attaching a copy of the voucher that had previously been reported lost, the ADA asked Inspector Jack Trabitz at the PCD to retrieve the rape kit.[3] Based on the barrel number for the rape kit that appeared on the voucher, the PCD was able to find the rape kit in a barrel located in the PCD's Pearson Place Warehouse in Queens.

In June 2006 the Office of the Chief Medical Examiner concluded that the DNA profile derived from the rape kit did not match Newton's DNA profile. Within a month, Newton and the District Attorney's Office jointly moved to vacate his conviction. The next day, the New York State Supreme Court vacated Newton's conviction pursuant to New York Criminal Procedure Law Section 440.10(1)(g). By this time, Newton had been incarcerated for more than twenty years. He had been seeking the evidence for the renewed testing that exonerated him – and had been repeatedly told that it no longer existed and could not be found – for over a decade.

---

[3] It is unclear how the ADA obtained this copy of the voucher.

## C.    Newton's Lawsuit

Newton was immediately released from prison and filed his lawsuit a year later.   His complaint asserted twenty-one causes of action against the City and individual defendants.   As relevant to this appeal, Newton alleged that the City's evidence management system "deprive[d] [him] of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution," as well as his right to access to the courts under the First Amendment.   In October 2009 the District Court dismissed his constitutional claims against the individual defendants so that only common law claims remained against some of them.

Relying on Osborne, however, the District Court allowed Newton to continue his claim against the City for violating his due process rights.[4]   In Osborne, the Supreme Court ruled that an Alaska statute that permitted a prisoner to challenge his conviction when newly discovered evidence requires vacatur of the conviction gave the plaintiff "a liberty interest in demonstrating his innocence with new evidence."   557 U.S. at 68.   The District Court concluded that Section 440.30(1-a)(a) of New York's Criminal Procedure Law[5]  conferred on

---

[4] The District Court also separately refused to dismiss Newton's First Amendment claim.

[5] Section 440.30(1-a)(a) was not enacted until 2004.   The District Court's mistaken reference to subsection (1-a)(a) – rather than to subsection (1-a), which was in effect at the time that Newton filed his pro se motion in State court seeking DNA testing of the rape kit – is understandable and of no moment because the relevant language in both versions of the statute is the same.   Compare N.Y. Crim. Proc.

9

Newton a similar "liberty interest in vacating his conviction by accessing evidence in the state's possession for the purpose of DNA testing."   Newton v. City of New York, 681 F. Supp. 2d 473, 489 (S.D.N.Y. 2010).   The court also determined that Newton had raised a triable question as to whether New York's procedures were inadequate to vindicate his rights: "Newton has tested New York's procedures and has shown them to fail."[6]   Id. at 490.

Before trial, discovery in the case uncovered the original voucher for the rape kit, which in turn revealed that the PCD had received a photocopy of an "out-to-court" log from the City's Corporation Counsel in 2009 indicating that the rape kit had last been removed in 1988.   The photocopy had prompted the PCD to review the file of out-to-court vouchers for 1988 and led to the discovery of the original voucher in that file.

---

Law § 440.30(1-a)(a) (McKinney 2004), with N.Y. Crim. Proc. Law § 440.30(1-a) (McKinney 1994).

[6] The District Court initially determined that Newton stated a claim against the City for failure to train or supervise.   The defendants then moved for reconsideration in light of Young v. County of Fulton, 160 F.3d 899, 904 (2d Cir. 1998), which held that a plaintiff could not sustain a municipal liability claim under a failure to train theory when the city's employees had violated a right that was not clearly established at the time.   In a January 2010 order, the District Court acknowledged that it was bound by our decision in Young and instead relied on Tenenbaum v. Williams, 193 F.3d 581, 595-97 (2d Cir. 1999), in which we allowed a plaintiff to pursue a claim against a municipality for an unlawful city policy when the rights at issue were not clearly established at the time of the violation.   Newton was then permitted to proceed on the theory that the City maintained an unlawful policy, custom, or practice.

After a three-week trial, a jury found that the City had denied Newton his First Amendment right of access to the courts and his Fourteenth Amendment right to due process of law, had "engaged in a pattern, custom or practice of mishandling evidence" and "acted with an intent to deprive . . . Newton of his constitutional rights or with a reckless disregard of those rights," and had proximately caused Newton's protracted incarceration.[7]  The jury awarded Newton $18 million in compensatory damages against the City.

The defendants moved to set aside the verdict pursuant to Rule 50 of the Federal Rules of Civil Procedure, arguing that our decision in McKithen v. Brown, issued after the verdict, foreclosed relief.   In granting that motion, the District Court relied on McKithen, Osborne, and New York Criminal Procedure Law Section 440.30(1-a)(b).   Based on McKithen and Osborne, it determined that Newton did not have "a right to receive the DNA evidence," but merely "a right to the process under the New York statute."   Newton v. City of New York, 784 F. Supp. 2d 470, 479 (S.D.N.Y. 2011) (emphases omitted).   It also interpreted Section 440.30(1-a)(b) as (1) authorizing a State court, faced with a motion to vacate, to order the police to disclose the last known physical location of evidence, but (2)

[7] The jury also found Inspector Jack Trabitz, the then-head of the PCD, and Sergeant Patrick McGuire, a PCD intake supervisor, liable for intentional infliction of emotional distress ("IIED").   The District Court later overturned the entirety of the jury's verdict, including its IIED finding.   Newton v. City of New York, 784 F. Supp. 2d 470, 483-85 (S.D.N.Y. 2011).   Newton does not appeal the District Court's decision on his IIED claims.   Therefore, we consider only Newton's First Amendment access-to-courts and Fourteenth Amendment due process claims against the City.

preventing the same court from drawing an unfavorable inference from the fact that the evidence has been lost.  Id. at 478.  The District Court observed that prior to the enactment of Section 440.30(1-a)(b) in 2004 the City was not obligated to disclose the location of evidence and that, in any event, Section 440.30(1-a)(b) contemplated the possibility of lost evidence.  Id. at 479-80.  For these reasons, the District Court held that Newton was entitled to no more than the last known location of the evidence.

The District Court also held that Newton's constitutional due process claim failed because there was not enough evidence that City officials had acted with a culpable state of mind.  Id. at 480-81.  It concluded that although Newton had demonstrated that the City's evidence management system was deficient, he had failed to prove that a specific person had acted with anything more than negligence.  In addition, relying on the failure of his underlying Fourteenth Amendment claim, the District Court granted the City's motion to set aside the verdict as to Newton's First Amendment claim.

Newton appealed.

## DISCUSSION

"We review de novo a district court's decision to grant a Rule 50 motion for judgment as a matter of law, applying the same standard as the district court." Cash v. Cnty. of Erie, 654 F.3d 324, 332-33 (2d Cir. 2011) (citations omitted).  A court may grant a Rule 50 motion only if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a

12

legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Although a party making a Rule 50 motion always faces a heavy burden, "[t]hat burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." Cash, 654 F.3d at 333 (quotation marks omitted).

## A. Fourteenth Amendment Due Process Claim

We review Newton's Fourteenth Amendment Due Process claim "according to the familiar two-part test for analyzing alleged deprivations of procedural due process rights: (1) whether [Newton] has a cognizable liberty or property interest under state or federal law . . .; and (2) if so, whether [Newton] was afforded the process he was due under the Constitution." McKithen, 626 F.3d at 151.

### 1. Newton's Liberty Interest

To determine whether New York law conferred on Newton a liberty interest in demonstrating his innocence with newly discovered evidence, we start with Osborne.

William Osborne was convicted by an Alaska jury of kidnapping, assault, and sexual assault and sentenced to twenty-six years in prison. 557 U.S. at 58. In a federal post-conviction proceeding, Osborne sued State officials under 42 U.S.C. § 1983, claiming the Due Process Clause gave him a constitutional right to access DNA evidence in the case for testing by an advanced method not available at the time of his trial. Id. at 60. The Ninth Circuit held that Alaska was

13

required to disclose the DNA evidence to Osborne as part of its Brady obligations, which extended to certain potentially viable post-conviction claims of actual innocence. Osborne v. Dist. Att'y's Office for the Third Judicial Dist., 521 F.3d 1118, 1128-32 (9th Cir. 2008), rev'd, 557 U.S. 52 (2009). Without identifying the precise standard Osborne needed to satisfy in order to prevail on his access-to-evidence claim, the Ninth Circuit determined that Osborne had demonstrated more than a reasonable probability that he would not have been convicted had the DNA evidence been disclosed to the defense at trial. Id. at 1133-34.

The Supreme Court reversed on the ground that there was no freestanding substantive due process right to DNA evidence. 557 U.S. at 72. Citing the progress of individual States in passing DNA-testing statutes, the Court expressed its reluctance to expand the scope of substantive due process or to embroil federal courts in questions of State-based policy – for example, questions such as "how long" a State must "preserve forensic evidence that might later be tested," or whether a State would be obligated to collect evidence before trial. Id. at 73-74.

Despite its reservations about expanding the scope of the substantive due process right, the Court located a liberty interest grounded in a general post-conviction relief statute enacted by the Alaska legislature that made

14

evidence from DNA testing available to defendants. Id. at 68. That statute

provided:

> A person who has been convicted of, or sentenced for, a crime may institute a proceeding for post-conviction relief if the person claims . . . (4) that there exists evidence of material facts, not previously presented and heard by the court, that requires vacation of the conviction or sentence in the interest of justice . . . .

Alaska Stat. § 12.72.010 (2008). A related provision stated, in relevant part:

> (b) . . . a court may hear a claim [brought under Alaska Stat. § 12.72.010] . . . (2) based on newly discovered evidence if the applicant establishes due diligence in presenting the claim and sets out facts supported by evidence that is admissible and . . . (D) [that] establishes by clear and convincing evidence that the applicant is innocent.

Alaska Stat. § 12.72.020 (2008). Based on these Alaska statutory provisions, the

Court concluded that "Osborne does . . . have a liberty interest in demonstrating

his innocence with new evidence under state law," 557 U.S. at 68, and that

"Alaska provides a substantive right to be released on a sufficiently compelling

showing of new evidence that establishes innocence," id. at 70.

The City does not genuinely dispute that New York law conferred on

Newton "a liberty interest in demonstrating his innocence with new evidence."

McKithen, 626 F.3d at 152. Newton retains such an interest even without the

City's concession. For the purpose of determining whether a liberty interest

exists in this case, we think the New York statute that Newton invokes is

materially indistinguishable from the Alaska statute upon which Osborne relied.

15

Specifically, at the time Newton filed suit, Section 440.10(1)(g)[8] of the New York Criminal Procedure Law provided that a court "may, upon motion of the defendant, vacate" a conviction on the ground that "[n]ew evidence has been discovered" that would probably have led to an outcome at trial more favorable to the defendant.[9]  N.Y. Crim. Proc. Law § 440.10(g) (McKinney 1970). Moreover, the State's explicit statement on the importance of DNA testing – reflected in its enactment of Section 440.30(1-a) in 1994 – only strengthens the case for State recognition of a liberty interest.

### 2.    What Process Was Due

We turn next to determine what process was due to vindicate Newton's State-created liberty interest in demonstrating his innocence with new evidence, mindful of Osborne's related pronouncement that "[t]his 'state-created right can,

---

[8]  Section 440.10(1)(g-1) now permits a judge to vacate a sentence in light of "[f]orensic DNA testing of evidence."   This section, which gives a movant a more specific liberty interest in proving his innocence with DNA testing, was not enacted until 2012, long after Newton's conviction was vacated.   See 2012 N.Y. Sess. Laws 294 (McKinney).   Newton therefore cannot rely on the current version of the statute.   Under Osborne, however, the broader language of subsection (1)(g) covers newly available DNA evidence and gives Newton a liberty interest.

[9]  Although the language of the Alaska statute in Osborne provides only that a court may "hear a claim" brought under Section 12.72.010, Alaska Stat. § 12.72.020(b) (2008) (emphasis added), and Section 12.72.010 provides only that the defendant may "institute a proceeding for post-conviction relief," id. § 12.72.010 (emphasis added), the Supreme Court read this State law to confer a liberty interest in demonstrating one's innocence with new evidence.   Osborne, 557 U.S. at 68.

in some circumstances, beget yet other rights to procedures essential to the realization of the parent right.'" 557 U.S. at 68 (quoting Conn. Bd. of Pardons v. Dumschat, 452 U.S. 458, 463 (1981)).

As the Supreme Court explained, "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man." Id. In identifying any "other" procedural rights that may exist in this case, therefore, we start with the principle that a defendant who has been convicted after a fair trial "has only a limited interest in postconviction relief" and that the State may flexibly fashion and limit procedures to offer such relief. Id. at 69. We have explained that "the . . . deferential standard of Medina v. California, 505 U.S. 437 (1992), governs the process due a prisoner seeking evidence for the purpose of obtaining post-conviction relief." McKithen, 626 F.3d at 152. In keeping with that standard, "which the Medina Court described as applying to 'state procedural rules which . . . are part of the criminal process,'" we evaluate New York's procedures for fundamental adequacy. Id. at 152-53 (quoting Medina, 505 U.S. at 443). Fundamental adequacy does not mean that State procedures must be flawless or that every prisoner may access the DNA evidence collected in his case. Nor does it mean that DNA evidence must be stored indefinitely. It means only that when State law confers a liberty interest in proving a prisoner's innocence with DNA evidence, there must be an adequate system in place for accessing that evidence that does not "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or

17

"transgress[] any recognized principle of fundamental fairness in operation.'" Medina, 505 U.S. at 445, 448 (quotation marks omitted).

Before turning to New York law (both in McKithen and in this case), we consider how these principles applied to the Alaska statute in Osborne. The procedures Alaska implemented to vindicate a defendant's right to post-conviction relief could not plausibly be described as inadequate under the Medina standard: with caveats not relevant here, Alaska law provided for discovery of newly available DNA evidence in post-conviction proceedings, 557 U.S. at 69-70, and the Alaska courts reinforced the statutory protection with a prophylactic measure that permitted defendants to access DNA evidence if they could demonstrate that (1) the conviction rested primarily on eyewitness identification evidence, (2) there was a demonstrable doubt concerning the identification of the defendant, and (3) scientific testing was likely to resolve the doubt, id. at 65 (citing Osborne v. State, 110 P.3d 986, 995 (Alaska Ct. App. 2005)). Moreover, in concluding that the Alaska State "procedures [we]re adequate on their face," the Supreme Court emphasized that "without trying them, Osborne [could] hardly complain that they do not work in practice," id. at 71, and that Osborne's decision to file a § 1983 action instead of "avail[ing] himself of all possible avenues for relief in [Alaska] state court" had impaired his due process claim, id. at 88 (Stevens, J., dissenting) (summarizing majority opinion). Accordingly, the Court concluded that Osborne had received the process he was

18

due and had no free-standing federal constitutional right to the DNA evidence he sought.

Although, as we have pointed out, the New York statute at issue in this case, Section 440.30(1-a), is in several respects quite similar to the Alaska statute in Osborne, what differences exist between the two statutes inure to Newton's benefit. For example, Alaska's statute requires that the new evidence prove actual innocence by clear and convincing evidence, while New York's Section 440.30(1-a) demands less of New York defendants, who must show only that the evidence creates a probability of a more favorable outcome. Considering the similarities and differences between the two statutes, we conclude that the liberty interest created by New York law is no narrower than that created by Alaska law; procedures for vindicating this interest therefore should also be evaluated under the standard described in Osborne.

In asking us in effect to condone its evidence management procedures in this case, the City invokes our decision in McKithen, on which the District Court also relied to dismiss Newton's Fourteenth Amendment claim. McKithen had been convicted by a Queens jury of a number of serious crimes. He moved pursuant to Section 440.30(1-a)(a) for DNA testing of evidence recovered at the crime scene. The State court denied his motion on the ground that "there was no reasonable probability that McKithen would have received a more favorable verdict had the forensic testing been performed and the results been admitted at trial." 626 F.3d at 146. McKithen then sued the Queens District Attorney in

19

federal court, claiming that the denial of access to evidence for post-conviction DNA testing on its face violated his right to due process under the Fourteenth Amendment. Rejecting McKithen's facial due process challenge, we held that New York State's procedure for post-conviction relief under Section 440.30(1-a)(a) is facially adequate, see id. at 152, and that federal courts "are to defer to the judgment of state legislatures concerning the process due prisoners seeking evidence for their state court post-conviction actions," id. at 153. Our decision in McKithen thus represented a straightforward application of Osborne to New York State law, as both Osborne and McKithen addressed direct facial challenges by plaintiffs relating to the effectiveness of State (in contrast to municipal) post-conviction relief procedures. See Osborne, 557 U.S. at 71.

McKithen resolved an issue different from the one that this appeal compels us to consider. Unlike McKithen, Newton readily concedes that the State's statutory procedures are adequate. Instead, he contends that the City, not the State, provided him with fundamentally inadequate process by undermining the State's procedures by its recklessly chaotic evidence management system. Having demonstrated that (in contrast to Osborne and McKithen) he diligently and repeatedly tried the State's procedures for obtaining the necessary DNA evidence, Newton claims that the NYPD's evidence management system was so inadequate as to nullify those procedures. This appeal and Newton's arguments thus present an issue that we have yet to address relating to the interaction between State law and local government in the context of post-conviction relief.

20

We are unaware of precedent that prevents Newton from challenging a municipal custom or practice that, he contends, undermines otherwise adequate State procedures.   McKithen certainly does not do so, and so the District Court erred insofar as it held that McKithen squarely foreclosed Newton's claims.   Moreover, by pointing out Osborne's failure to avail himself of Alaska's procedures, Osborne appears to have contemplated precisely such as-applied challenges by plaintiffs who attempt unsuccessfully to invoke State post-conviction relief procedures.   See 557 U.S. at 71.

The procedures created by Section 440.30(1-a) require the State, upon a defendant's motion, to "show what evidence exists and whether the evidence is available for testing."   People v. Pitts, 4 N.Y.3d 303, 311 (2005).[10]   In essence, Section 440.30(1-a) creates an "essential" corollary procedural right to a faithful accounting of evidence.   See Osborne, 557 U.S. at 68.   In New York, local government appears to play an integral role in this process, see N.Y.C. Admin.

---

[10] Pitts was decided in 2005 after the New York State Legislature amended Section 440.30(1-a) through the addition of subsection (b), which permitted a court to "direct the people to provide the defendant with information in the possession of the people concerning the current physical location of the specified evidence and if the specified evidence no longer exists or the physical location of the specified evidence is unknown, a representation to that effect and information and documentary evidence in the possession of the people concerning the last known physical location of such specified evidence."   N.Y. Crim. Proc. Law § 440.30(1-a)(b); see 2004 N.Y. Sess. Laws 2794 (McKinney).   However, the New York Court of Appeals concluded that the statute as originally enacted did not "place on defendants the burden to establish the location and status of the evidence they seek to be tested."   Pitts, 4 N.Y.3d at 311.

Code § 14-140(a)(1)-(2) (instructing the property clerk of the PCD to "take charge of all property" seized by police and requiring that "[a]ll such property . . . be described and registered by the property clerk in a record kept for that purpose"), and a failure of local government in carrying out its role can nullify the adequacy of State procedures and expose the municipality to constitutional liability.

This is hardly a new concept.   In other contexts we have permitted plaintiffs to pursue claims against municipalities for deprivations of State-created interests.   See, e.g., Kapps v. Wing, 404 F.3d 105, 112, 118-26 (2d Cir. 2005) (City administration of State Home Energy Assistance Program was constitutionally inadequate to vindicate plaintiffs' property interest in program benefits); Winston v. City of New York, 759 F.2d 242, 247-49 (2d Cir. 1985) (provision of City Administrative Code violated teachers' due process rights by depriving them of a property interest in their contractual right to a pension, derived from the State Constitution); see also Goldberg v. Kelly, 397 U.S. 254, 260-66 (1970) (City procedures inadequate to vindicate rights created by State and federal programs). If procedures followed by a municipality rather than a State prove to be constitutionally inadequate, even in the context of facially adequate State procedures, then a defendant may sue the municipality for violating his due process rights on the ground that the municipality's implementation of State procedures is inadequate.

Even in the realm of municipal (rather than State) inadequacy, however, we must take care to avoid "suddenly constitutionaliz[ing]" the area of DNA testing

22

and thereby "plac[ing] the matter outside the arena of public debate and legislative action." Osborne, 557 U.S. at 73 (quoting Washington v. Glucksberg, 521 U.S. 702, 720 (1997)). At least three factors help us avoid that pitfall here.

First, reinstating the § 1983 verdict against the City will not impair the validity of, or expand the rights provided by, Section 440.30(1-a)(a). As noted, this case presents a challenge to the City's execution of State law, not to the law itself. See McKithen, 626 F.3d at 153 ("[T]he Osborne Court was clear that the lower federal courts are to defer to the judgment of state legislatures concerning the process due prisoners seeking evidence for their state court post-conviction actions." (emphasis added)); see also id. at 154 ("Barring proof of fundamental inadequacy, Osborne obligates us to defer to the New York [State] legislature's judgment . . . ."). We defer to States in this area because "it is normally within the power of the State to regulate procedures under which its laws are carried out," Patterson v. New York, 432 U.S. 197, 201 (1977) (quotation marks omitted), and States have "considerable expertise in matters of criminal procedure and the criminal process . . . grounded in centuries of common law tradition," Medina, 505 U.S. at 445-46.

Second, when, as here, a municipality promulgates policies or practices that affect the criminal procedure laws of the State, those policies or practices may fail to reflect the considered judgment of the State legislature. A local pattern, custom, or practice may frustrate or even obstruct otherwise adequate State law procedures. In those instances, it seems to us, neither Osborne nor Medina

23

mandates the same level of deference to local government as they do to State legislative action.

Third, the procedural right at issue here is quite narrow: Newton was not entitled to the preservation of evidence under State law, but only to a faithful accounting of the evidence in the City's possession. We do not decide what specific City procedure is necessary to manage and track evidence. We simply reinstate a jury verdict that found that the then-existing system was inadequate and that the City, through its agents, servants, or employees, intentionally or recklessly administered an evidence management system that was constitutionally inadequate and that prevented Newton from vindicating his liberty interest in violation of his Fourteenth Amendment right to due process.

The addition in 2004 of New York Criminal Procedure Law Section 440.30(1-a)(b) does not alter our analysis. That section provides that in conjunction with a motion to vacate under Section 440.30:

> [T]he court may direct the people to provide the defendant with information in the possession of the people concerning the current physical location of the specified evidence and if the specified evidence no longer exists or the physical location of the specified evidence is unknown, a representation to that effect and information and documentary evidence in the possession of the people concerning the last known physical location of such specified evidence. If there is a finding by the court that the specified evidence no longer exists or the physical location of such specified evidence is unknown, such information in and of itself shall not be a factor from which any inference unfavorable to the

24

people may be drawn by the court in deciding a motion under this section.

N.Y. Crim. Proc. Law § 440.30(1-a)(b). By envisioning that evidence might be lost or destroyed, the provision reinforces the limited nature of a convicted defendant's liberty interest in proving his innocence through DNA evidence. But it does so without eliminating the requirement that fundamentally adequate procedures be in place to allow the defendant to vindicate that interest. Again, a fundamentally adequate system for permitting defendants to access evidence does not mean one in which evidence is never lost or destroyed. Any police department will occasionally lose evidence, including useful evidence; absent more, that lapse will not violate a defendant's due process rights. See Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Rather, Section 440.30(1-a)(b) is consistent with requiring the NYPD's evidence management system to provide an adequate means to determine if evidence is available for testing and, if so, where the evidence is located. In addition, Section 440.30(1-a)(b)'s proscription that no "inference unfavorable to the people may be drawn" from the fact that evidence is missing or destroyed applies exclusively to motions to vacate. The legislature's reasonable determination that a convicted defendant should not be released

25

because the police have lost relevant evidence does not prevent an exonerated person from having a civil remedy under § 1983 against a municipality for an inadequate evidence management system.

### 3. Whether the Evidence Was Sufficient for a Reasonable Jury to Find that the City Denied Newton the Process He Was Due

To impose liability on a municipality under § 1983, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of Cnty. Comm'rs of Bryan Cnty. Okla. v. Brown, 520 U.S. 397, 403 (1997) (citing Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 694 (1978)). The City acknowledges that the District Court correctly instructed the jury that in order to find the City liable it was required to find that the "municipality itself directly cause[d] the constitutional violation by a policy, custom or practice," that is, "a persistent, widespread course of conduct by municipal officials or employees that has become the usual and accepted way of carrying out policy, and has acquired the force of law, even though the municipality has not necessarily formally adopted or announced the custom." Joint App'x 2672. Nevertheless, the City argues that there was insufficient evidence to support the jury's findings that the City's evidence management system was fundamentally inadequate, and that the City officials' failures and misconduct relating to that system reflected a practice or custom.

A careful review of the record demonstrates otherwise. The PCD Property Guide describes the NYPD's official evidence management system and also

26

contains the PCD's policies and procedures for storing and tracking evidence. According to the Property Guide, a key tool for tracking a particular piece of property was a "yellow invoice" created when the property arrived at a PCD borough office. The yellow invoice was stored in an "active yellows" file. Whenever the property moved, its new location was to be printed on the yellow invoice. When the property was transported to court, the yellow invoice was to be stored temporarily in an "out-to-court yellows" file, with an "out of custody" card placed in its stead in the active yellows file. When the property was destroyed or auctioned, that fact and the date of destruction or sale were noted on the yellow invoice and the invoice itself placed in a "closed-out yellows" box. If property was missing from its storage location, the supervisor of the PCD facility was required to start a preliminary search that included (1) asking the arresting officer whether the property was ever removed to court and subsequently repackaged after return, and then (2) checking with Pearson Place Warehouse, a warehouse facility in Queens, to determine if the missing property was located there.

The NYPD's evidence management system failed miserably in Newton's case. When Newton moved for DNA testing under Section 440.30(1-a), the District Attorney's Office filed an opposition containing a statement by an NYPD Sergeant that mistakenly reported that the evidence and yellow invoice had likely been destroyed. In fact, the yellow invoice for the rape kit had been in the PCD "out-to-court yellows" folder since May 1988, when the evidence was first

27

removed to be examined. The invoice had never been returned to the active yellows file, even though the rape kit had been returned to storage at Pearson Place Warehouse. Sergeant Thomas O'Connor was involved with documenting property stored in another PCD warehouse in the Bronx and ultimately assigned to locate the yellow invoice for the rape kit while Newton's federal suit was pending. In one search, he found hundreds of property items and evidence with no paperwork attached to them in the warehouse, as well as "[a]bout a hundred or so" loose invoices that had not been marked either "destroyed" or "auctioned." Joint App'x 2407-08. Included among the loose invoices were invoices for Newton's blue suede sneakers and for clothing from the victim, V.J., related to Newton's case. See Joint App'x 2408; see also Joint App'x 2767, 2773.

Of course, as Sergeant O'Connor's experience suggested, the problem of lost invoices and evidence was by no means isolated to Newton's case: Sergeant O'Connor was aware of other evidence that had been lost, Joint App'x 2401, and the NYPD's failure to track evidence appears to have been pervasive. Around the time of Newton's trial, the Bronx property clerk's office had hundreds of "out-to-court yellows" folders, dating back to the 1970s, that contained thousands of yellow invoices; the property reflected on those invoices had never been returned to the PCD or, like the rape kit in Newton's case, had been returned but not properly recorded. Joint App'x 2403. Inspector Jack Trabitz, the PCD's commanding officer at the time of the 2010 jury trial, testified that between approximately 1800 and 3200 invoices went out to court from the Bronx borough

28

office each year from 1994 to 2006.   Joint App'x 2220.   Sergeant Bruce Kessler, the commanding officer of the Bronx PCD borough office from approximately 1992 to 2003, could not even recall the procedure for evidence retrieval in the event an item of evidence had not been returned to the borough office after a year. Joint App'x 2359-60.[11]

The failures of the NYPD's evidence management and retrieval system directly affected the offices of the District Attorneys, as well as certain non-governmental entities.   From 2005 to 2009, requests from the District Attorney's offices for post-conviction evidence frequently went unanswered because logbooks contained inaccurate information and in "[n]umerous" cases

---

[11] Although Newton refrains from advancing a failure-to-train claim on appeal, we cannot help but note that, based on the evidence, the inadequacy of the City's evidence management system appears to have been rooted in some part in the City's inadequate training of NYPD officers regarding evidence management. According to the evidence at trial, several PCD officers, including high-ranking officials, were unfamiliar with the Property Guide and lacked training in evidence management.   And before 1995, when the Property Guide was created, there was no written procedure for evidence management.   Joint App'x 2357.   As a result, both a former commanding officer who supervised the PCD starting in 1990 and one of his successors who started in 2000 received no formal training whatsoever regarding the operations of the PCD.   Joint App'x 2516-17, 2519, 2164. Similarly, throughout the 1990s, lower-ranking officers who worked at the PCD – including the Pearson Place Warehouse – failed to receive relevant training or a written manual on property and evidence management.   Joint App'x 2461, 2464. More disturbing still, Integrity Control Officers responsible for ensuring that employees at the PCD complied with the procedures in the Property Guide appeared to be unfamiliar with those procedures or the evidence management component of their positions.   Joint App'x 2166, 2345-47, 2364, 2598.

29

yellow invoices were missing. Only about twenty percent of prosecutorial requests for pre-1988 post-conviction evidence were satisfied. Joint App'x 2401. Other, equally disquieting examples of missing invoices involved the Innocence Project, an organization devoted to exonerating innocent convicted defendants. See Joint App'x 2601. At the request of the Innocence Project in 2006, the PCD identified and located eighty-seven invoices relevant to Innocence Project cases. Nevertheless, the City acknowledged that the remaining eighty-three relevant invoices "were not in the custody of the [PCD], ha[d] already been destroyed or were released according to Department procedures." Joint App'x 3444; see also Joint App'x 2556, 2610. Fifty percent of the cases that the Innocence Project terminated in the City over a ten-year period were closed because the PCD had lost or destroyed DNA evidence.[12] Joint App'x 2603.

Newton also adduced evidence that, prior to his release, the PCD had no reliable system to determine what evidence had been destroyed and that, as a result, evidence may have been improperly destroyed, or, as in Newton's case, reported destroyed when it had not been. Prior to 2000, for example, the PCD routinely disposed of rape kits,[13] Joint App'x 2171-73, as well as so-called "white"

---

[12] According to the testimony of an Innocence Project attorney, the national percentage of Innocence Project cases closed due to lost or destroyed DNA evidence was significantly lower than the percentage of such cases in the City. Joint App'x 2603.

[13] In 2006 the commanding officer of the PCD finally issued a written memorandum instructing that sexual assault evidence kits should never be destroyed. Joint App'x 2172-73.

invoices, which described whether a piece of evidence had been destroyed or retained by the NYPD, Joint App'x 2469. Destroying the white invoice for evidence prevented the PCD from tracking that evidence. In 1992 and 1998, moreover, the PCD engaged in what may aptly be characterized as sweeps, in which it disposed of a substantial amount of arrest evidence that had not been claimed. Joint App'x 2470. Although the evidence management system improved after 2000, the PCD's commanding officer starting that year was unaware that the Property Guide prohibited the destruction of arrest evidence without a district attorney release, and he admitted that arrest evidence may have been improperly destroyed under his command. Joint App'x 2171.

Newton's expert witness, an "evidence specialist" who consulted with police departments throughout the United States regarding evidence management, also described the inadequacy of the NYPD's evidence management system. The expert concluded that the City's evidence management system, as it existed from 1994 to 2005, was "sporadic at best." Joint App'x 2497. Aspects of the system, including chain-of-custody procedures and practices, were "weak, if not nonexistent" and failed to meet the most widely accepted professional or "industry standards" in the field of evidence management.[14] Joint App'x 2490; see also Joint App'x 2491.

---

[14] According to Newton's expert witness, the two most widely accepted industry standards in the field of evidence management are promulgated by the International Association of Property and Evidence, an organization that

31

In sum, Newton presented evidence that thousands of sometimes decades-old yellow invoices at the Bronx property clerk's office – out of a total of not more than 3200 such invoices per year – were in old out-to-court folders that had improperly never been closed out; evidence listed as "out-to-court" for over twenty years was lost; the PCD had lost track of and was unable to retrieve evidence in an unreasonably large number of cases (involving evidence older than five years); several high-level officials tasked with supervising the NYPD's evidence management system were unfamiliar with the PCD's procedures; and the PCD's dysfunction had an unconstitutionally deleterious effect on case closings in a large number of cases, including, obviously, Newton's. The problem in Newton's case was with the retrieval of evidence that was sitting there all along. Despite the preservation of the evidence that proved crucial in exonerating Newton, the PCD was unable to locate it from 1994 to 2005 and inaccurately represented that it had been destroyed either in a fire or pursuant to a regular disposal procedure that may not even have existed. Had Newton accepted the City's recklessly erroneous representations about the evidence at face value, he might have remained in prison far longer than he did. Taken together, this evidence supports a finding that the City, through the poor

provides educational resources and training on evidence management practices, and the Commission on Accreditation for Law Enforcement Agencies, a credentialing authority that determines whether law enforcement agencies have met industry-wide public safety standards. Joint App'x 2484-85.

administration of its evidence management system, perpetuated a practice or custom that was wholly inadequate.

We acknowledge the City's argument that a § 1983 plaintiff seeking to hold a municipality liable must "show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Brown, 520 U.S. at 404. There must be "proof that the municipality's decision was unconstitutional" to "establish that the municipality itself [i]s liable for the plaintiff's constitutional injury." Brown, 520 U.S. at 406 (emphasis added). The Supreme Court has declined to consider "whether something less than intentional conduct, such as recklessness or gross negligence, is enough to trigger the protections of the Due Process Clause."[15] Daniels v. Williams, 474 U.S. 327, 334 n.3 (1986) (quotation marks omitted). But in Brown it held that "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences." Brown, 520 U.S. at 407 (quotation marks omitted). Although we have not explicitly addressed this question in our

---

[15] The Supreme Court has held that in a § 1983 claim against a municipality for failure to train its police force, a plaintiff is required only to show that the municipality was deliberately indifferent to the rights of those with whom the police would come into contact; however, the Court distinguished that standard from the state of mind required for an underlying claim of a constitutional violation. City of Canton, Ohio v. Harris, 489 U.S. 378, 388 & n.8 (1989).

33

subsequent cases, see Barbera v. Smith, 836 F.2d 96, 99 (2d Cir. 1987), we have maintained that "a state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983."[16]  Morales v. N.Y. State Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988).

In keeping with Brown and Morales, we conclude that under the circumstances presented here Newton at most needed to demonstrate that the City acted with recklessness or deliberate indifference[17] toward his constitutional rights.[18]  Here, of course, the jury actually found that the City had "acted with an

---

[16] Other courts of appeals have suggested that recklessness or deliberate indifference may suffice to establish grounds for a constitutional violation.  See, e.g., Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991); Torres Ramirez v. Bermudez Garcia, 898 F.2d 224, 227 (1st Cir. 1990); Wood v. Ostrander, 879 F.2d 583, 587-88 (9th Cir. 1989); Comm. of U.S. Citizens Living in Nicar. v. Reagan, 859 F.2d 929, 948-50 (D.C. Cir. 1988).

[17] "[T]he Courts of Appeals have routinely equated deliberate indifference with recklessness."  Farmer v. Brennan, 511 U.S. 825, 836 (1994).

[18] It is not altogether clear that Newton was required to make even this showing (although, as we explain infra, he has plainly done so).  A plaintiff can identify a municipal policy by proving the existence of an unlawful practice or custom that is "so manifest as to imply the constructive acquiescence of senior policy-making officials."  Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992)).  After considering Newton's Fourteenth Amendment claim, the jury also found that the City "directly cause[d] the constitutional violation by a policy, custom or practice," because the mismanagement of evidence was "persistent" and "widespread," "ha[d] become the usual and accepted way of carrying out policy, and ha[d] acquired the force of law."  Joint App'x 2672.  Because Newton

34

intent to deprive . . . Newton of his constitutional rights or with a reckless disregard of those rights." Joint App'x 3502. This finding, to which we afford "considerable deference," is supported by the record. See Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 671 (2d Cir. 2012). And so a recklessness or deliberate indifference analysis should have compelled the District Court to uphold the 2010 jury verdict.

### 4. Arizona v. Youngblood

Our conclusion is consistent with Arizona v. Youngblood, 488 U.S. 51 (1988). In Youngblood, the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed," id. at 56 n.*, and is relevant "when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been

---

proved that the City engaged directly in an unlawful custom or practice, he may not have also needed to prove that City officials acted with recklessness or deliberate indifference. See Brown, 520 U.S. at 404 ("Where a plaintiff claims that a particular municipal action itself violates federal law, . . . resolving [the] issues of fault and causation is straightforward."). We do not need to decide that issue here, however, because the trial evidence supports the jury's finding of reckless disregard.

35

subjected to tests, the results of which might have exonerated the defendant," id. at 57.

In light of Youngblood, we must again recognize that a fundamentally adequate system for permitting defendants to access evidence may be, and will be, imperfect – one where evidence is sometimes lost or inadvertently destroyed. Largely because this is not a "failure to preserve" case, however (the DNA evidence that Newton sought was preserved, after all), our holding falls outside the scope of Youngblood and reflects the limited prescription of Section 440.30(1-a)(b), which demands only that the NYPD's evidence management system provide an adequate means to determine if evidence is available for testing and, if so, where the evidence is located. Although Youngblood makes clear that Newton was not entitled to the preservation of evidence, he was entitled to a faithful accounting of the evidence in the City's possession. Otherwise, it seems to us, the statutory scheme developed by the State would have little if any purpose.

Our view that Youngblood does not control the disposition of this appeal is fortified when we consider the two concerns that appear to have animated Youngblood's requirement that the plaintiff show bad faith on the part of the police under these circumstances. First, the requirement relieves courts from undertaking "the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Id. at 58 (quotation marks omitted). Second, the Court was "unwilling[] to read the 'fundamental fairness'

36

requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Id. (citation omitted). "[R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Id.

Neither concern exists in this case.[19] As an initial matter, Newton may recover under § 1983 for inadequate evidence management because the DNA evidence had already exonerated him. The District Court did not need to "divine" the exculpatory import of the DNA evidence; its import was clear by the time Newton started this action with the benefit of that evidence. In addition, we neither discern nor impose an "absolute" duty on the police to preserve evidence based on a freestanding constitutional due process right. To the contrary, Section 440.10(1)(g) applies to newly discovered evidence, including new DNA test results, and says next to nothing about a duty to maintain evidence.

---

[19] The jury did not find that the City acted in bad faith, as defined in Youngblood, and the record does not support such a finding.

In short, had the City destroyed his DNA evidence according to a legitimate procedure that conformed with State law, Newton would have no claim under § 1983.   Without deciding a question not before us, we do not see how an incarcerated defendant (or even a person like Newton) without exonerating evidence obtained by invoking State procedures would have a due process claim for relief under § 1983 based on our holding today.   In contrast to Youngblood, the issue here is whether a municipality may be held liable for its reckless maintenance of a system that made it impossible to retrieve evidence that had been preserved, that State law recognized as particularly significant, and that ultimately exonerated the defendant.

### 5. Jury Instructions Regarding Newton's Due Process Claim

Lastly, the City also challenges the jury instructions relating to Newton's due process claim.   The District Court instructed the jury that it could find that the City had violated Newton's Fourteenth Amendment rights only if, among other requirements, "the City engaged in a pattern, custom or practice of mishandling evidence by operating a poor or a nonexistent evidence management system," and this "violated [Newton's] constitutional rights by . . . denying [Newton] his Fourteenth Amendment right to due process by employing an inadequate evidence management system that caused City employees to prematurely abandon their search for his evidence in 1994 under the mistaken assumption that it had been destroyed."   Joint App'x 2673.

38

The challenged jury instructions were not wrong. They correctly required the jury to find that the City's evidence management system was "inadequate" as a matter of due process if it prevented Newton from availing himself of the procedures in Section 440.30(1-a)(a). The jury instructions also correctly premised the City's liability on the failure of its evidence management system to <u>account</u> for the evidence, not on the destruction of evidence. <u>Cf.</u> Joint App'x 2673.

## B. <u>First Amendment Court-Access Claim</u>

Newton also claims that the City is liable under § 1983 for violating his First Amendment right of access to the courts based on its failure to provide him with evidence to challenge his conviction. We need not address this issue at length. Because the jury awarded damages on the § 1983 claim in order to "compensate . . . Newton for any pain and suffering caused by the city's failure to produce the rape kit for test[ing]," Joint App'x 2720, the damages award would be reinstated in full even if we were to affirm the District Court with regard to either Newton's Fourteenth Amendment due process claim or his First Amendment access-to-the-courts claim, as long as we did not affirm with regard to both. <u>Cf.</u> <u>This is Me, Inc. v. Taylor</u>, 157 F.3d 139, 146 (2d Cir. 1998) ("As long as there is some evidence based upon which the jury could have held [the defendants] individually liable, we must reinstate the verdict.").

In any event, the District Court's decision to grant the City's motion to set aside the jury's verdict on this claim appears to have rested almost entirely on its

39

rejection of Newton's underlying Fourteenth Amendment claim that the City violated his procedural right to due process. On appeal, the City parrots the District Court's rationale, arguing that Newton's access-to-courts claim fails because he had no viable constitutional claim to DNA evidence in the first place. Having rejected the premise of the District Court's decision and the City's principal argument, we vacate the District Court's judgment dismissing Newton's First Amendment claim and remand to the District Court to reconsider the claim, if necessary, in light of this opinion.[20]

**CONCLUSION**

We are confident that the evidence management failures identified in this case have been or will soon be remedied with the help of modern technological advances and stronger recordkeeping practices. For the foregoing reasons, however, we VACATE the judgment of the District Court and REMAND the case with instructions to reinstate the jury verdict with respect to Newton's Fourteenth Amendment claim and to reconsider Newton's First Amendment claim in light of this opinion.

---

[20] The City also argues that Newton's access-to-courts claim was inadequately pleaded and procedurally barred and that Newton forfeited his First Amendment claim because he first mentioned denial of access in his trial brief and in his opposition to the defendants' August 2010 motion to dismiss. After reviewing the record, we conclude that both arguments are without merit.