WOOD, Chief Judge,
dissenting.
Most cases in which a prisoner raises a claim about constitutionally inadequate medical care in the prison are brought against the doctor or other professional who actually delivered the services. In those cases, as Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), illustrate, the prisoner may prevail only if the providers exhibited deliberate indifference to a substantial risk of serious harm. The Eighth Amendment, after all, is about unconstitutional punishment, not about medical competence. But there is another theory that has been cognizable under 42 U.S.C. § 1983 ever since the Supreme Court decided Monell v. Dep’t of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Overruling Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), insofar as that case held that municipalities are immune from suit under section 1983, Monell drew a line between respondeat superior liability and direct liability for the municipal organization’s own policies. It rejected the former, but it held that the latter was actionable. That latter theory is the one under which plaintiff Alma Glisson, acting as the personal representative of her deceased son, Nicholas L. Glisson, is seeking to recover damages against Correctional Medical Services, Inc. (Corizon), the company that was responsible for the deplorable medical care Glisson received in Indiana’s Plainfield Correctional Facility. (Unless the context requires otherwise, my references to “Glis-son” mean Nicholas, not Alma.)
In Minix v. Canarecci, 597 F.3d 824, 835 (7th Cir.2010), this circuit confirmed that private corporations that contract with jails or prisons to provide medical services are treated the same as municipalities for purposes of liability under section 1983. That rule applies to defendant Corizon. Alma Glisson asserts that Cori-zon maintained a policy that led directly to her son’s death. My colleagues have concluded that she cannot prevail — indeed, that the paper record is so one-sided that it was proper for the district court to grant summary judgment in Corizon’s favor. That conclusion can stand only if they have correctly depicted what it takes to prove that Corizon’s policies violated the Eighth Amendment. They characterize this case as a complaint about the lack of a policy, and they assert that the plaintiff must therefore show a series of incidents or a widespread practice. Alma Glisson did not submit such evidence (at least not in a timely fashion), and so, they conclude, she fails. This syllogism assumes that policies are always affirmatively stated and that a decision not to regulate cannot also be a policy. Nothing in Monell or later eases, however, so holds. The relevant questions in all instances are (a) what is the policy at issue, and (b) whether that policy reflects deliberate indifference to a serious medical need. Taking the facts in the light most favorable to the plaintiff, a rational jury could find that Corizon deliberately structured the delivery of medical care in a way that lacked critical oversight. That policy in Glisson’s case predictably had fatal results. I would reverse and send this case to trial.
*669 I
Before turning to the legal analysis, it is helpful to review the facts in some detail. Although Glisson had suffered from bad health for many years, he was able to function on his own until he was taken into custody by the Indiana Department of Corrections (INDOC) on September 3, 2010 (following his conviction for giving one prescription painkiller pill to a friend). Indeed, he not only lived independently, but he also provided care to his grandmother and his dying brother. After 41 days in custody, 37 of which were in IN-DOC’s care, prison staff found him dead in his cell. The coroner concluded that Glis-son died of “complications of laryngeal cancer.” But that was not all he said. He also noted Glisson’s “malnutrition,” “extreme emaciation and cachexia [wasting away of tissue].” Consultant Dr. Stephen Radentz, a forensic pathologist, agreed with those conclusions, and added that Glisson suffered from acute renal failure with hyperkalemia (ie. too much potassium in the blood), dehydration and volume depletion, acute respiratory insufficiency or pneumonia, and altered mental status. Finally, for purposes of this litigation, Glis-son’s estate retained Diane Sommer, M.D., who prepared a report finding “[w]ithin a high degree of medical certainty ... that the health care [Glisson] received through out [sic] his brief incarceration lead [sic] to his early death.”
No one disputes that Glisson’s health was poor before he went to prison. He had been diagnosed with laryngeal cancer in 2003. In October of that year, he had radical surgery in which his larynx and part of his pharynx were removed, along with portions of his mandible (jawbone) and several teeth. He was left with a permanent stoma (that is, an opening in his throat), into which a tracheostomy tube was normally inserted. He needed a voice prosthesis to speak. Over the years, Glis-son had additional treatments. Importantly for our case, the 2003 surgery and follow-up radiation left his neck too weak to support his head; this in turn made his head slump forward in a way that impeded his breathing. Because physical therapy and medication for this condition were ineffective, he wore a neck brace. He also developed cervical spine damage.
In 2008 doctors placed a gastrojejunosto-my tube in his upper abdomen for supplemental feeding. Finally, there was some evidence of cognitive decline.
Despite all this, Glisson was able to care for himself in the home. He learned to clean and suction his stoma independently. With occasional help from his mother, he was able to use his feeding tube when necessary. He was still able to swallow well enough to take his food and other supplements by mouth most of the time. His hygiene was fine, and he helped with household chores such as mowing the lawn, cleaning, cooking, and caring for his brother.
The events leading up to Glisson’s death began when a friend, acting as a confidential informant for the police, convinced Glisson to give the friend a prescription painkiller. Glisson was charged and convicted for this infraction, and on August 31, 2010, he was sentenced to a period of incarceration and transferred to the Wayne County Jail. Before sentencing, Dr. Borrowdale, one of his physicians, wrote a letter to the court expressing serious concern about Glisson’s ability to manage in a prison setting. Dr. Borrowdale noted Glisson’s severe disabilities from cancer and from alcohol dependence, his difficulty speaking because of the laryngectomy, his trouble swallowing, his severe curvature of the spine (kyphosis), and his problems walking. The conclusion of the letter was prophetic: “This patient is severely dis *670 abled, and I do not feel that he would survive if he was incarcerated.” Dr. Fisher, another of Glisson’s physicians, also warned that Glisson “would not do well if incarcerated.”
Glisson’s family brought his essential supplies to the Wayne County Jail, including his neck brace and the suction machine, mirror, and light that he used for his tracheostomy. When he was transferred on September 3 to INDOC’s Reception Diagnostic Center, the Jail sent along his mirror, light, and neck brace, but it is unclear what happened to these items. Glisson never received the neck brace while he was at Plainfield, nor was he given a replacement.
At the Diagnostic Center, Nurse Tim Sanford assessed Glisson’s condition, accurately as far as one can tell. Sanford recorded Glisson’s account of his medication regimen, and noted that Glisson appeared to be alert and able to communicate. Sanford noted that Glisson had a tracheostomy that had to be suctioned six times a day, and that Glisson had a feeding tube but that he took food through it only when he had difficulty swallowing. After that evaluation, Glisson was placed in the general population.
From this point on, Glisson’s care began to resemble the blind men’s description of the elephant. Different people took steps that were never coordinated or supervised by a single responsible medical provider. No provider furnished a comprehensive investigation of his medical condition. On September 5, staff reported that Glisson was angry and throwing candy out of his cell. (Glisson disputes this, and so this fact cannot be taken as established for summary judgment purposes.) Nurse Rachel Johnson tried to take his blood pressure, but could not. She recorded a pulse of 60 and an oxygen saturation level of 84%, which was low. (The record includes evidence indicating that normal oxygen saturation ranges between 95 and 100%; saturation below 90% is a sign of respiratory distress.) Some staff thought that Glis-son seemed confused, but Johnson found him to be alert and oriented. The staff told her that Glisson had consumed only milk in the past two days and that he was not cooperating with their efforts to handcuff him for a clinic visit. They tested his oxygen saturation again and found it to be fluctuating between 84% and 94%. At that point, they took him to the clinic and allowed him to use his suction machine. Also, for reasons that are largely unclear, they identified him as a suicide risk and transferred him to segregation.
Glisson’s care over the next couple of weeks was disjointed: no provider developed a medical treatment plan, and thus no one was able to check Glisson’s progress against any such plan. In fact, for his first 24 days in INDOC custody, no Cori-zon provider even reviewed his medical history. Dr. Gal-lien requested his medical history on September 10. But there is no evidence that anyone responded to his request, and no one followed up on that request until September 27, when Dr. Ma-laka G. Hermina asked for the records and received them within several hours. Except for one instance on September 10, no Corizon provider ever tried to contact Glis-son’s mother or any other relative for information. During this time, Glisson’s oxygen saturation rate bounced up and down, occasionally reaching troubling lows: On September 5 it fluctuated between 84% and 94%; it rose to 96% when he was allowed to use his suction machine; it sank back to 86% on September 6 before suctioning restored it to 94%; it was back down at 84% on September 8, and so on. Glisson’s weight, never high, was also deteriorating. On September 9 a psychiatrist, Dr. Conant, recorded that he had lost *671 weight; later that day a nurse practitioner ordered that Glisson be given the nutritional supplement Ensure. No one kept any daily account of how much — if any— Ensure Glisson consumed.
When Glisson was transferred from the holding facility to Plainfield on September 17, 2010, he weighed 119 pounds. There is no record of anyone’s monitoring his weight, although on September 27 Dr. Hermina noted that Glisson appeared ca-chectic, which means undernourished to the point that the person has physical wasting and loss of weight and muscle mass. See MedicineNet.com, Definition of Cachectic, http://vmnu. medicinenet. com/ script/main/art. asp ?articlekey =40464-Dr. Hermina ordered a second nutritional supplement, Jevity, but he did not make any recording of Glisson’s weight. As noted above, the coroner also noted Glisson’s emaciation.
During this time, Glisson’s mental status was also deteriorating. Dr. Sommer’s report charts that process and notes at various points how the deterioration could have been halted if a qualified medical professional had been evaluating the full picture. Such an evaluation would have shown, Dr. Sommer said, a clear correlation between Glisson’s underlying medical problems and his mental state. Her report comments on the drugs Glisson was taking. He was switched from Effexor to Prozac without any evaluation; worse, he was not monitored or weaned off Effexor while the Prozac was started. The two drugs work quite differently, the report notes, and it concludes that “[t]his abrupt change in medication contributed to [Glis-son’s] decline in function.”
While Glisson was in custody, he had numerous episodes of altered mental status. Despite this fact, Dr. Gallien (again operating on the basis of incomplete information) noted on September 10 that Glis-son had “no real mental health issues.” Yet at roughly the same time, Health Services Administrator Kelly Kurtz called Glisson’s mother to ask whether he had any abnormal behavioral issues, such as spitting on the floor. Alma Glisson said no. There is no record that Kurtz told anyone about this, or that any Corizon provider could or did take this information into account in structuring Glisson’s treatment.
Dr. Conant did conduct a mental health evaluation on Glisson on September 23. His findings were worrying, but no one connected them with any of the physical data on file, such as Glisson’s tendency to have inadequate oxygen profusion and his cachexia. Dr. Conant found that Glisson was restless, paranoid, delusional, hallucinating, and insomniac. He placed Glisson under close observation and settled on a diagnosis of unspecified psychosis; he saw no need for medication. Had he looked, he would have seen that Glisson had no history of psychosis, and he might have considered (as the post-mortem experts did) the possibility that lack of oxygen and food was affecting Glisson’s mental performance. Dr. Conant noted that he thought that Glisson’s hallucinations were caused by morphine. This observation, too, was reached in an information vacuum. In fact, Glisson had been on narcotic medication for some time prior to his incarceration. Had Dr. Conant known of Glisson’s medical history, he would have known that morphine was an unlikely cause and he would have looked further.
The. Corizon providers never took any steps to integrate the growing body of evidence of Glisson’s malnutrition with his overall mental and physical health. On September 4, Glisson’s urinalysis results showed the presence of ketones and leukocytes. Dr. Sommer’s report notes, without contradiction in the record, that “[k]etones *672 suggest the presence of other medical conditions such as anorexia, starvation, acute or severe illness and hyperthyroidism to name a few.” “Leukocytes,” it said, “are a sign of possible infection.” The medical staff did nothing to address either potential problem, even though a second urine sample taken on September 5 showed an increase in ketones and leukocytes. There is no evidence in the record that a physician reviewed either of those lab results. That is so even though the record includes a note saying that on September 5 Glisson “had not been eating and seemed confused.” Rather than probing the signs of infection and dehydration further, the staff opted to put Glisson in the psychiatric unit under suicide watch.
The blood work continued to raise red flags. On September 9, it came back with signs of abnormal renal function. Although Glisson met with Dr. Gallien the next day, no one looked at the bloodwork until September 27. At that point, Dr. Hermina ordered fasting labs for September 28. When the results were returned on September 29, they showed acute renal failure — information that prompted Dr. Hermina to send Glisson immediately to Wishard Hospital. A jury could easily conclude that Glisson was already slipping into renal distress as early as September 4 or 9, but that the uncoordinated care Cori-zon furnished allowed his condition to become acute. Recall that Dr. Radentz listed acute renal failure as a cause of his death.
Last, anyone with a good overall knowledge of Glisson’s health problems would have realized that he was at high risk for aspiration pneumonia because he had undergone major surgery that had disrupted his swallowing mechanism, he had a stoma and feeding tube, and he had a cervical-spine problem that caused laxity in his neck. Whether or not his neck brace was transferred from the jail to the prison is beside the point: the record shows that he never received it, and it was not replaced'. The only care he received for his neck and throat was suctioning, and then only after he was already hypoxic. Someone lost his voice prosthesis too. It was not replaced, despite the fact that there is evidence in the record to support a finding that its absence greatly increased the potential of aspiration and pneumonia, and that those were listed as contributing causes of death.
II
It was not Alma Glisson’s burden ultimately to convince the district court that Corizon’s policy violates the Constitution; she needed only to show that there are genuine issues of material fact and that a rational jury could so conclude. In my view, the more complete account of the facts provided above leaves room for no other outcome. Two questions are critical: first, whether Corizon is automatically entitled to judgment if its staff committed no constitutional violation; and if the answer is no, then second, whether a jury could find that Corizon’s failure to formulate protocols to guide care for chronically ill inmates violates the Eighth Amendment.
A
There are two points on which I agree with my colleagues in the majority. We all accept that under the law as it presently exists, there is no respondeat superior liability in a case under section 1983 even for a private corporation such as Corizon. This court noted in Shields v. Illinois Dep’t of Corrections, 746 F.3d 782, 789-96 (7th Cir.2014), that there may be some question about that proposition, but we went no further, and so for now the applicability of Monell’s rule to private entities such as Corizon remains established. In addition, we all understand that Glisson *673 did not need to prove that the individual providers’ care was deliberately indifferent in order to prevail. We squarely held in Thomas v. Cook Cnty. Sheriff's Dep’t, 604 F.3d 293 (7th Cir.2010), that “we find unpersuasive the County’s argument that it cannot be held liable under Monell because none of its employees were found to have violated [plaintiffs] constitutional rights.” Id. at 304. Sometimes the nature of the constitutional violation, the theory of municipal liability, and the defenses will cause a Monell claim to fail because of the lack of any underlying violation, but sometimes it will not. Our case falls in the latter category. Individual medical providers may act within constitutional boundaries, both objectively and subjectively, but if there is an unconstitutional policy at the corporate level, the corporation must answer for it.
B
This takes me to the essence of my disagreement with the majority. My colleagues read Glisson’s complaint as alleging only that it was Corizon’s failure to implement INDOC’s Health Care Service Directive that violated the Eighth Amendment, rather than as presenting a broader argument attacking Corizon’s decision not to require centralized monitoring of inmates with complex medical conditions. Certainly if Corizon had implemented the state’s Directive, quoted ante at 665-66, no policy would have stood in the way of adequate care for prisoners (such as Glis-son) with chronic diseases. INDOC guidelines recognize the need for “planned care in a continuous fashion,” and it is obvious that Glisson received nothing of the kind. My colleagues see this as a complaint about the lack of a policy, ante at 665, and they then conclude that in this situation a plaintiff must present evidence of a series of incidents or a widespread practice constituting custom and usage. That is not Glisson’s claim. Even if it were, I see no support for the final step of the majority’s line of reasoning.
The Supreme Court’s decision in Los Angeles Cnty. v. Humphries, 562 U.S. 29, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010), unanimously reaffirms that the key holding of Monell is that a municipal policy or custom must be at stake, no matter what type of relief is sought. 562 U.S. at 31, 131 S.Ct. 447. Monell’s requirement of a policy or custom is meant to ensure that a municipality is held liable only in situations where its “deliberate conduct” is the “moving force” causing the injury- — that is, the deprivation results “from the decisions of ... those officials whose acts may fairly be said to be those of the municipality.” Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 403-04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (emphasis in original).
The Court has enumerated several ways to demonstrate that the municipality’s own conduct is at stake, not that of its employees or agents. First, it has held that “[l]ocal governing bodies ... can be sued directly under § 1983 ... where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body’s officers.” Humphries, 562 U.S. at 36, 131 S.Ct. 447 (quoting Monell, 436 U.S. at 690-91, 98 S.Ct. 2018). A municipality can also be sued for “deprivations visited pursuant to governmental ‘custom’ even though such a custom has not received formal approval through the body’s official decisionmaking channels.” Id. (emphasis added).
In other words, either the content of an official policy, a decision by an official deci-sionmaker, or evidence of custom will suffice. It is true that a plaintiff must show multiple incidents to prove a custom or *674 practice that has not been “officially adopted and promulgated.” Id. But if she seeks to establish municipal liability by either of the other two methods — proving that the unconstitutional action resulted from a policy or a decision by the entity’s “authorized decisionmakers” — she need not show multiple incidents. Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). In such cases, “the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.” Id.
The choice the majority has framed— written policy versus lack of written policy — is therefore a false one. The majority assumes that because Glisson attacks Cori-zon’s failure to enact certain protocols, he is alleging the absence of a policy. Not at all. Glisson alleges that Corizon had a deliberate policy that eschewed coordinated care: in essence, a policy not to have a policy and instead to rely on each provider’s isolated decisions. And even if Glis-son were alleging only the absence of a written policy, it does not follow that he must prove a custom. Glisson’s allegations — and his evidence — fit comfortably within the “authorized decisionmaker” route, which does not require proof of multiple incidents. Id. Nowhere does Glis-son allege that Corizon has an informal custom of not creating a protocol for centralized treatment plans. He alleges instead that it made an affirmative, official decision not to do so. Policymakers make decisions to act and not to act; there is no reason why an official decision not to act should be any less culpable — or any less official — under section 1983 than one to act. Corizon was well aware of the IN-DOC Directive. After seven years, it is reasonable to infer that Corizon’s decision not to enact the required protocols was deliberate and was made by persons within Corizon with decisionmaking authority. (Indeed, it is hard to infer anything else.)
Even if Glisson’s claim fits awkwardly into the methods mentioned in Monell, that is not a problem unless one reads Monell as providing an exhaustive, not an illustrative, list. But nothing in Monell or later cases supports such a mechanistic approach. Monell’s methods of proof are not ends; they are means. They suggest three paths to the same place: proof that “the municipal action was taken with the requisite degree of culpability.” Brown, 520 U.S. at 404, 117 S.Ct. 1382. Monell was about the conditions necessary to attribute conduct to the municipal “person” under section 1983: that is, whether the action in question can properly be considered the municipality’s “deliberate conduct.” Id. The harm itself — or the number of harms — is irrelevant for this purpose. Where there is strong evidence of official culpability — as there is in this case — a court need not worry about which path the plaintiff takes to proving that the municipality is culpable. What matters is that the proof point to the municipality’s own act.
The essential prerequisite to deliberateness — and thereby culpability — is knowledge of the risk at issue. In policy-omission cases, it is the plaintiffs burden is to present “evidence that there is a true municipal policy at issue, not a random event.” Calhoun v. Ramsey, 408 F.3d 375, 380 (7th Cir.2005). Such evidence is “necessary to understand what the omission means:” it could reflect nothing more than the municipality’s ignorance of the problem’s existence or gravity or its preference for another permissible course. Id. (“No government has, or could have, policies about virtually everything that might happen.”). To be attributed to the municipality as a “policy,” a course of action must be “consciously chosen from among various alternatives;” therefore, evidence must “be adduced which proves that the inadequa *675 cies resulted from conscious choice — that is, proof that the policymakers deliberately chose a ... program which would prove inadequate.” Id. (quoting City of Oklahoma City v. Tuttle, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). When they lack evidence from which a conscious choice can be inferred, plaintiffs may prove that the municipality had a custom or practice of dealing with incidents in a certain way; in other words, they may use circumstantial evidence to show an unspoken policy. Common sense says that one incident cannot constitute a custom. But where a plaintiff does present evidence from which the municipality’s knowledge and choice can be inferred, there is no reason why proving multiple incidents should be necessary.
That is why we have stated that, where a municipal entity has “actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction.” King v. Kramer, 680 F.3d 1013, 1021 (7th Cir.2012) (alteration omitted) (quoting Warren v. District of Columbia, 353 F.3d 36, 39 (D.C.Cir.2004)). It is why we have noted that a policymaker may be directly liable where he has actual knowledge of a risk but nonetheless ignores it. See Steidl v. Gramley, 151 F.3d 739, 741 (7th Cir.1998) (“If the warden were aware of ‘a systematic lapse in enforcement’ of a policy critical to ensuring inmate safety, his ‘failure to enforce the pohcy’ could violate the Eighth Amendment.”) (quoting Goka v. Bobbitt, 862 F.2d 646, 652 (7th Cir.1988)). It is why we have held that where a situation calls for procedures, rules or regulations, the “failure to make a policy is also actionable.” Thomas, 604 F.3d at 303 (citing Sims v. Mulcahy, 902 F.2d 524, 543 (7th Cir.1990)).
For the same reason, the Supreme Court has noted that even where there is no evidence of actual notice, deliberateness may be inferred where a risk is sufficiently obvious. For example, in its failure-to-train cases, the Court has said that where, “in light of the duties assigned to specific ... employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, ... the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.” City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197 (1989).
Here, Glisson has presented evidence that supports a reasonable inference that Corizon made “a deliberate choice to follow a course of action ... from among various alternatives,” and therefore may be held liable as a municipality under section 1983. Harris, 489 U.S. at 389, 109 S.Ct. 1197 (quoting Pembaur, 475 U.S. at 483-84, 106 S.Ct. 1292 (plurality opinion)). The Indiana Department of Corrections saw fit to promulgate Health Care Services Directive 2.06 on “Chronic Disease Intervention Guidelines.” The Guidelines say that “[e]ach facility must establish a site specific directive that guides the management of chronic disease management and clinics.” They instruct that this directive should ensure that “[c]are provided to [inmates with chronic illnesses] should be organized and planned and should be consistent across facility lines.” They add other essential criteria for the care of the chronically ill, including the need for an individualized treatment plan that includes objectives for care and is kept current.
This Directive squelches any possible argument Corizon might have about a lack of awareness of the risk of not having protocols for the care of inmates with chronic illnesses. Timing is not on Cori-zon’s side either. Seven years after the Directive appeared, Corizon had yet to make any policy change with regard to the *676 comprehensive treatment of chronically ill inmates. In its responses to Glisson’s interrogatories, Corizon admitted that it was aware of the Directive’s existence and that it had done nothing to comply with its dictates. The most plausible inference — if not the only one — is that Corizon consciously chose, without medical justification, simply not to enact protocols for managing the care of these vulnerable inmates.
One does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care. In Harris, the Court recognized that because it is a “moral certainty” that police officers “will be required to arrest fleeing felons,” “the need to train officers in the constitutional limitations on the use of deadly force ... can be said to be ‘so obvious,’ that failure to do so could properly be characterized as ‘deliberate indifference’ to constitutional rights.” 489 U.S. at 390 n. 10, 109 S.Ct. 1197. It was just as certain that Corizon providers would be confronted with patients with chronic illnesses. The need to establish protocols for the coordinated care of chronic illnesses is obvious, just as is the recklessness exhibited by failing to do so. On the record here, a jury could reasonably find that Corizon’s “policymakers were deliberately indifferent to the need” for such protocols, and that the absence of protocols caused Glis-son’s death. Id. at 390, 109 S.Ct. 1197.
Indeed, it is not necessary to rely on the obviousness of these risks, because the Directive provided all the information Cor-izon needed. Through it, Corizon was “aware of ‘a systematic lapse in enforcement” of the directive, a policy critical to ensuring inmate safety.’ ” Steidl, 151 F.3d at 741.
It had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and nonetheless it “adopt[ed] a policy of inaction.” Kramer, 680 F.3d at 1021. A jury could conclude that Corizon, indifferent to the serious risk such a course posed to chronically ill inmates, made “a deliberate choice to follow a course of action ... from among various alternatives” to do nothing. Harris, 489 U.S. at 389, 109 S.Ct. 1197. Monell requires no more.
In closing, it is important to stress that I am not arguing that the Constitution or any other source of federal law required Corizon to adopt the Directive or any other particular document. But the Constitution does require it to ensure that a well-recognized risk for a defined class of prisoners be competently addressed and not deliberately left to happenstance. Corizon had notice of the problems posed by a total lack of coordination. Yet despite that knowledge, it did nothing for more than seven years to address that risk. There is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent. See Woodward v. Correctional Medical Services, 368 F.3d 917, 929 (7th Cir.2004) (“CMS does not get a ‘one free suicide’ pass.”).
Nicholas Glisson may not have been destined to live a long life, but he was managing his difficult medical situation successfully until he fell into the hands of the Indiana prison system and its medical-care provider, Corizon. Forty-one days after he entered custody, he was dead. On this record, a jury could find that Corizon’s obdurate failure to enact centralized treatment protocols for chronically ill inmates led directly to his death. I would reverse the judgment below and remand for a trial.